*In re: D.M., J.M.*, No. 0998, September Term 2020

**APPEAL AND REVIEW – INTERLOCUTORY ORDERS**
Under Maryland Code (1974, 2020 Repl. Vol.), § 12-303(3)(x) of the Courts and Judicial Proceedings Article, an interlocutory order is immediately appealable if it deprives parents of the care and custody of their children or changes the terms of such an order. In a Child in Need of Assistance or "CINA" case, an order amending a permanency plan of reunification with a parent to add a concurrent plan of placement with a relative for custody and guardianship is immediately appealable under § 12-303(3)(x) because the addition of a concurrent plan of placement with a relative for custody and guardianship broadens the permanency plan and has the potential to deprive a parent of care and custody of their child.

**CHILDREN IN NEED OF ASSISTANCE – MODIFICATION OF PERMANENCY PLAN**
The juvenile court has discretion to amend a permanency plan when the court considers the statutory factors of Maryland Code (1984, 2019 Repl. Vol), § 5-525(f)(1) of the Family Law Article, and acts in the best interests of the children. In this case, the juvenile court considered the statutory factors, the father's past conduct, the children's best interests, and the goal of achieving a timely, permanent placement for the children in ordering an amendment of the permanency plan to add a concurrent plan of placement with a relative for custody and guardianship.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0998

September Term, 2020

_____

IN RE: D.M., J.M.

_____

Arthur,
Shaw Geter,
Ripken,

JJ.

_____

Opinion by Arthur, J.

_____

Filed:  May 25, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Mr. M., the father of nine-year-old D.M. and seven-year-old J.M., appeals the order of the Circuit Court for Baltimore County, sitting as the juvenile court, amending the permanency plan for his children from a sole plan of reunification with a parent to a concurrent plan of reunification with a parent and placement with a relative for custody and guardianship. Mr. M. argues that the juvenile court erred in changing the permanency plan without considering the statutory factors set forth in Md. Code (1984, 2019 Repl. Vol.), § 5-525(f)(1) of the Family Law Article ("FL"). He also argues that the court abused its discretion in adding the concurrent plan of custody and guardianship by a relative.

Because we hold that the juvenile court adequately considered the statutory factors, with primary consideration given to the best interests of the children, we shall affirm the order of the juvenile court.

## **FACTUAL AND PROCEDURAL BACKGROUND**

D.M. and J.M. first came to the attention of the Baltimore County Department of Social Services ("the Department") in August 2017 after their half-sibling, E.T., was born substance-exposed.[1] At that time, D.M. and J.M. were six and four years old, respectively, and living in the care of their maternal grandmother ("Grandmother").

Both children had lived with Grandmother for the majority of their lives—D.M. moved into Grandmother's house with his mother and Mr. M. in early 2013 (when she was about two years old), and the family continued living with Grandmother after J.M.

---

[1] Because Father is not the father of E.T., E.T. is not included in this appeal.

was born in June 2013.  Mr. M. lived with the children, Grandmother, and the children's mother ("Ms. P.") until he separated from Ms. P. in 2015.

After E.T.'s birth in August 2017, the Department attempted to meet with Mr. M. and Ms. P. to determine a safety plan for D.M. and J.M.  Mr. M. informed the Department that he was involved with his children, but was unable to care for them because he was living in Pennsylvania and had a history of substance abuse.  The parties agreed that D.M. and J.M. should be placed in temporary custody with Grandmother.

On February 20, 2018, the Department concluded that "[r]easonable but unsuccessful efforts [had been] made to prevent or eliminate the need for a CINA finding" and petitioned the juvenile court to find that D.M. and J.M. were Children in Need of Assistance ("CINA").  On March 9, 2018, counsel for D.M., J.M., and their half-sibling filed an emergency request that the children be placed in shelter care with Grandmother, so that she would obtain the authority to make medical and educational decisions on their behalf.  On that same day, the juvenile court placed the children in shelter care and granted Grandmother temporary, limited guardianship of the children.

At a CINA adjudication hearing on June 11, 2018, the juvenile court granted a continuation of shelter care with Grandmother.  Father did not oppose the children's continued placement with Grandmother.[2]

---

[2] In regard to the failure to complete a CINA disposition within 60 days after children are placed in shelter care, *see In re K.Y.-B.*, 242 Md. App. 473, 485 n.4 (2019).

2

### 1. From July 6, 2018, to December 7, 2018

On July 6, 2018, the juvenile court held a disposition hearing and found the children to be CINA because both parents had substance-abuse issues that prevented them from providing appropriate care. As a result of the hearing, the court granted the Department custody of D.M. and J.M. and continued the placement with Grandmother. The court ordered that Mr. M.: (1) provide family background information, comply with service agreements, and maintain consistent weekly contact with the Department; (2) obtain clean, stable, hazard-free housing; and (3) submit to a substance abuse evaluation, participate in substance abuse treatment, and submit to random drug testing. The court also ordered a CINA review hearing date of December 7, 2018, and a permanency planning hearing date of May 6, 2019.

During the review period from July 6, 2018, through December 7, 2018, Mr. M. moved from Pennsylvania to Maryland. He informed the Department that he had attended a three-week drug-rehabilitation program from July to August 2018, but did not provide the Department with requested documentation to confirm his attendance.

Following his discharge from the program, Mr. M. lived with his family in Westminster and Baltimore and maintained weekly, supervised visits with the children. However, in October 2018, Mr. M. was arrested and charged with possession of a stolen firearm, possession of drug paraphernalia, possession of narcotics with an intent to distribute them, possession of more than 10 grams of marijuana, and possession of

3

controlled substances other than marijuana. After his arrest, Mr. M. stopped maintaining contact with the Department.

At the December 7, 2018, review hearing, Mr. M. agreed that the children should not be placed with him, but he requested unsupervised visitation. The court denied his request, but continued to allow liberal, supervised visitation. Grandmother continued to have custody of the children and temporary, limited guardianship.

The court ordered Mr. M. to maintain consistent contact with the Department, comply with substance-abuse treatment recommendations and submit to random drug screens, maintain stable, clean and hazard-free housing, and obtain gainful employment. In its order, the court informed Mr. M. that the permanency plan could be changed if he failed to make "significant progress to remedy the circumstances that caused the need for removal" or if he was "unwilling or unable to give the child[ren] proper care and attention within a reasonable period of time."

### 2. December 7, 2018, to May 6, 2019

During the period from December 7, 2018, through May 6, 2019, when the next permanency planning hearing occurred, the Department reported that the children continued to thrive in Grandmother's care. D.M. no longer demonstrated a need for therapy and was doing well in school. J.M. continued to receive in-school therapy and enjoyed spending time with his siblings, including his younger half-brother, E.T., who resided with Grandmother as well.

After his arrest in October 2018, Mr. M. had stopped consistently visiting the children, but had maintained regular contact through video calls and phone calls.

4

Because Mr. M. no longer had a cell phone, the Department was frequently unable to communicate with him. The Department heard concerns from family members that Mr. M. may have been using illegal substances.

At the permanency planning hearing on May 6, 2019, the Department requested that the juvenile court continue the commitment of the children to the Department and continue the limited guardianship with Grandmother. The Department also requested that the permanency plan be amended from reunification with a parent to a concurrent plan of reunification with a parent and placement with a relative for custody and guardianship or adoption.

Mr. M. agreed that he "need[ed] to get himself into a better situation to be able to assume care" for the children. He also agreed with the Department's request for continued commitment and placement with Grandmother. However, Mr. M. objected to the Department's request for a concurrent permanency plan and asked for "a little more time" to move towards the plan of reunification. The court denied the Department's request and continued the permanency plan of reunification.

### 3. May 6, 2019, to October 11, 2019

At the next permanency plan review hearing, on October 11, 2019, the Department reported that D.M. and J.M. continued to thrive in the stability of Grandmother's care. The Department also reported that Father had tested positive for cocaine and had refused a request to submit to a hair-follicle drug test. He had visited the children "sporadically," had not provided the Department with his address or telephone number, had canceled a

scheduled meeting with the Department's representative, and had not responded to requests to reschedule the meeting.

At the permanency plan hearing, Father informed the Department that he had entered a substance-abuse treatment program, but did not provide the Department with documentation confirming his participation in the program. He did, however, submit to a hair-follicle test, which was negative.

Mr. M. agreed to continue the commitment of D.M. and J.M. and to continue the guardianship with Grandmother, but argued for a continuation of the sole plan of reunification. The Department, by contrast, requested that the permanency plan be changed to a concurrent plan of reunification and adoption by a relative, because Mr. M. had not made "a significant change" demonstrating that he was "moving forward . . . to actually parent his children[.]"

A magistrate, finding that "appropriate and reasonable efforts were made" to finalize the plan of reunification, recommended the continuation of the sole plan of reunification. The Department filed exceptions to the refusal to recommend a concurrent plan.

### 4. October 11, 2019, to November 5, 2020

An exceptions hearing was scheduled for January 13, 2020, but was postponed until November 5, 2020, first because Ms. P. was incarcerated, then because of the coronavirus pandemic, and then to allow Ms. P. to obtain counsel. A permanency plan review hearing was scheduled for March 20, 2020, but was postponed until November 5,

2020, first because of the pandemic and then because Ms. P. had not received proper notice.

At the beginning of the October 2019 review period, Mr. M. informed the Department that he had found employment. Nonetheless, he refused to identify the employer or provide documentation of his employment, saying twice that he did not want to pay child support.

Mr. M. began participating in a substance-abuse program in February 2020, but after losing his job and his health insurance in March 2020, he stopped attending. He did not inform the Department that he had lost his job. Nor did he inform the Department that he had moved from Westminster to his mother's residence in Baltimore until four months after the move. The Department had been attempting to visit his Westminster address in order to conduct a home study.

Except for a three-week period during December 2019, Mr. M. maintained consistent weekly, supervised visits with D.M. and J.M. When in-person visitations were halted in March 2020 because of the stay-at-home order at the outset of the pandemic, Mr. M. spoke with his children regularly through video calls and phone calls. After in-person visitation resumed, Mr. M. agreed to outside visits in Grandmother's backyard for safety reasons; however, the Department reported that from July to October 2020, Mr. M. did not visit consistently.

Mr. M. began to make progress towards reunification in July 2020. After being approved for Medicaid, Mr. M. began participating in a new substance-abuse treatment program at the MAT Clinic. Mr. M. continued a parenting anger-management program

that he had begun before the pandemic and completed the program in September 2020. Mr. M. obtained his driver's license and began working as a delivery driver for Amazon. He complied with the Department's request for drug-testing, albeit one month later than requested, and tested negative for all non-prescribed substances. On September 9, 2020, Mr. M. moved the juvenile court for unsupervised visits, citing the steps he had been taking towards reunification. The Department approved his request.

### 5. November 5, 2020, Permanency Plan Review and Exceptions Hearing

On November 5, 2020, the juvenile court finally held the exceptions hearing and permanency plan review hearing that had been postponed for much of the year. At the hearing, the Department applauded the steps Mr. M. had recently taken, stating that he had "done considerably better than he had done during the first three years of this case." However, the Department noted that the case had begun in 2017 and that the children remained CINA; thus, the Department requested that the court order a permanency plan of reunification concurrent with a plan of custody and guardianship or adoption by a relative.

Counsel for the children requested that the court modify the permanency plan to a concurrent plan of reunification and guardianship by a relative (and not adoption). Counsel explained that, while Mr. M. had made progress over the past nine months, they remained concerned about "the length of time it has taken for . . . Mr. [M.] to get to this point[.]" ]

Mr. M. testified as to the progress he had made during this review period. He had been employed as a delivery driver with Amazon for "about a month" and worked four

8

days a week, from 9:30 am to 6:00 pm.  Although he was still living with his mother, he planned to sign a lease on a two-bedroom townhouse once he obtained the additional paystubs to help determine what his rent payment would be.

In its closing argument, the Department reiterated its request that the court adopt a concurrent plan of reunification and either placement with a relative for custody and guardianship or adoption by a relative.  The Department explained that Grandmother had consistently been "the parent" throughout the children's lives.  The Department also explained that Grandmother planned to adopt E.T., the children's half-brother.  The Department argued that Grandmother has provided "security for these children" and "has always provided wonderful and good care."

Counsel for D.M. and J.M. agreed with the Department's argument, but asked the court not to include adoption as a potential concurrent plan.  Counsel explained that, while the children have a "good relationship" with Mr. M., "[t]hey do not wish to live with their father[;] they like living where they are.  They feel safe . . . and secure at their grandmother's home."  Counsel argued that Mr. M. had been employed only for one month and that, while he had made progress, it was too soon to consider placing the children with him.

Counsel for Mr. M. argued that the permanency plan should remain one of reunification alone, because, she said, Mr. M. "has addressed the issue which brought this case as far as he was concerned to this Court."

The juvenile court agreed that Mr. M. "has worked very diligently to improve his situation" and that he had not done anything recently "to put his parenting rights in

9

jeopardy." The court granted Mr. M. liberal and unsupervised visits "with every other weekend overnights, when and if [Mr. M.] obtains suitable housing."

The court found that it was in the best interests of the children to adopt a concurrent permanency plan of placement with a relative for custody and guardianship; thus, the court granted the Department's exceptions in part. The court stated its findings were "based upon a variety of factors." Evidently referring to Maryland Code (1984, 2019 Repl. Vol), § 5-525(f)(1) of the Family Law Article, the court cited "the factors in the statute" as factors that it had considered. The court added that it had, "most importantly," considered "the best interest of the children." The Court set a permanency plan review hearing date of April 5, 2021.

Mr. M. filed this timely appeal.

### MOTION TO DISMISS

The Department and the children move to dismiss this appeal, arguing that the order is not appealable because the addition of the concurrent plan "does not materially impact or diminish [Mr. M.'s] ability to regain custody." As a threshold matter, therefore, we must determine whether a parent can take an immediate appeal of a juvenile court's order amending a permanency plan of reunification to add a concurrent plan of placement with a relative for custody and guardianship.

In general, a party may appeal only from "a final judgment entered in a civil or criminal case by a circuit court." Maryland Code (1974, 2020 Repl. Vol.), § 12-301 of the Courts and Judicial Proceedings Article ("CJP"). *See In re C.E.*, 456 Md. 209, 220 (2017) (quoting *Kurstin v. Bromberg Rosenthal, LLP*, 191 Md. App. 124, 131 (2010),

10

*aff'd*, 420 Md. 466 (2011)) ("[t]he right to appeal is not a constitutional right, but rather . . . 'a grant of legislative grace'").

To qualify as a final judgment, an order "must be 'so final as either to determine *and conclude* the rights involved or to deny the appellant the means of further prosecuting or defending his or her rights and interests in the subject matter of the proceeding.'" *Metro Maint. Sys. South, Inc. v. Milburn*, 442 Md. 289, 299 (2015) (quoting *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41 (1989)) (emphasis in original); *accord Monarch Acad. Baltimore Campus, Inc. v. Baltimore City Bd. of Sch. Comm'rs*, 457 Md. 1, 43 (2017); *Huertas v. Ward*, 248 Md. App. 187, 200 (2020). "In other words, the order 'must be a complete adjudication of the matter in controversy, except as to collateral matters, meaning that there is nothing more to be done to effectuate the court's disposition.'" *Huertas v. Ward*, 248 Md. App. at 201 (quoting *Metro Maint. Sys. South, Inc. v. Milburn*, 442 Md. at 299). All of the parties correctly acknowledge that an order changing a permanency plan in a CINA case is not a final judgment.

The Court of Appeals has identified three exceptions to section 12-301's finality requirement: (1) appeals from interlocutory orders specifically allowed by statute; (2) immediate appeals permitted under Maryland Rule 2-602(b); (3) and appeals from interlocutory rulings allowed under the collateral order doctrine. *In re C.E.*, 456 Md. at 221 (citing *Salvagno v. Frew*, 388 Md. 605, 615 (2005)). All of the parties agree that the juvenile court's order could be appealable only under CJP § 12-303(3), which permits appeals from specified interlocutory orders.

11

Specifically, CJP § 12-303(3)(x) permits parties to appeal from an order "[d]epriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order[.]" An order changing a permanency plan is immediately appealable under § 12-303(3)(x) if the order "operate[s] to deprive" a parent of the care and custody of their children or "change[s] the terms" of a parent's care and custody of their children. *In re Samone H.*, 385 Md. 282, 299 (2005); *see In re Damon M.*, 362 Md. 429, 437-38 (2001) (holding that if a permanency plan for reunification is amended or modified to a permanency plan for adoption, long-term care, or permanent foster care, it is an immediately appealable order).

In *In re Karl H.*, 394 Md. 402, 430 (2006), the Court explained that, in determining the appealability of an interlocutory order in child custody cases, "the focus should be on whether the order and the extent to which that order changes the antecedent custody order." "If the change could deprive a parent of the fundamental right to care and custody of his or her child, whether immediately or in the future, the order is an appealable interlocutory order." *Id*.

In *Karl H.*, the juvenile court approved a concurrent permanency plan of reunification with the parents and adoption by a non-relative. *Id.* at 405-06. On the parents' appeal, the Court reasoned that because reunification "gives a parent the opportunity for reconciliation" but adoption would "terminate a parent's rights along with the hope of reunification[,]" reunification and adoption are "mutually exclusive goals, and are directly contradictory goals[.]" *Id.* at 431. Thus, the Court held that the approval

12

of a concurrent plan of adoption was "sufficiently far enough along the continuum of depriving a parent of a fundamental right and [was] immediately appealable." *Id.* at 430.

Similarly, in *In re Joseph N.*, 407 Md. 278, 291 (2009), the Court held that orders that effectively broaden a permanency plan to a parent's detriment are immediately appealable under CJP § 12-303(3)(x). There, the mother appealed after the juvenile court continued a permanency plan of reunification, but moved the child from foster care into the custody of his father. *Id.* at 291-92. The Court reasoned that because the permanency plan did not explicitly specify whether the goal was reunification with the mother or the father, the order "expanded the universe of persons eligible for reunification" by placing the child in the father's custody. *Id.* at 292. "[T]he Department's focus was no longer limited to making reasonable efforts to reunify [the child] with [his mother] and was instead, broadened to facilitate [the child's] reunification with either his mother or his father." *Id.* The broadening of the plan operated to the mother's detriment, because it "had the potential to facilitate and accelerate a grant of full custody to" the father rather than to her. *Id.* Because a "meaningful shift in direction" occurred when the permanency plan was broadened, the Court held that the order was immediately appealable under CJP § 12-303(3)(x). *Id.*

On the other hand, when a CINA order does not "adversely affect" the parent's parental rights or "change the permanency plan terms to [the parent's] increased detriment[,]" the order is not appealable under CJP § 12-303(3)(x). *In re Samone H.*, 385 Md. at 316. For example, in *In re Samone H.*, the juvenile court continued the terms of the permanency plan, but denied the mother's motion for an independent "bonding

study." *Id.* at 315-16. In holding that the mother did not have the right to take an immediate appeal of the order under § 12-303(3)(x), the Court determined that, while a bonding study could "be beneficial to the determination of a permanency plan[,]" the order denying the study did not adversely affect the mother's parental rights or change the terms of the permanency plan to her detriment. *Id.* at 316-17.

Similarly, in *In re C.E.*, 456 Md. at 226-27, the Court held that a parent could not take an immediate appeal under § 12-303(3)(x) when the court granted the Department's motion to "waive reasonable efforts to reunify" the mother with the child, but did not change the permanency plan of placement with relatives and left the child in the custody of the relatives. There, the Court held that the order did not represent a "meaningful shift in direction" because it did not deprive the mother of the care or custody of her child. *Id.* at 224. Instead, "[t]he order merely relieved the Department of its obligation to foist services upon an uncooperative parent." *Id.*

Here, the Department and the children contend that the order adding a concurrent plan of placement with a relative for custody and guardianship is not an appealable interlocutory order because, unlike a concurrent plan of adoption, "the expectation that the parent will regain custody is not diminished." The Department argues that because the order has no immediate effects, the appeal should be dismissed. The Department distinguishes *In re Karl H.*, which allowed an appeal from an order implementing a concurrent plan of reunification and adoption, because a plan of adoption obligates the Department and the court to move promptly to a decision about the termination of parental rights. *See* CJP § 3-823(g). By contrast, the Department argues, if a court

14

changes a plan of reunification to a concurrent plan of reunification and placement with a relative for custody and guardianship, no similar obligations arise.

While we agree that a concurrent plan of adoption imposes specific deadlines and creates potential ramifications that are absent from a concurrent plan of placement with a relative for custody and guardianship, we disagree that a concurrent plan of custody and guardianship lacks the potential to deprive a parent of care and custody of a child. Like reunification and adoption, reunification and custody and guardianship by a relative are "mutually exclusive" and "directly contradictory" goals. *In re Karl H*., 394 Md. at 431. Just as it is impossible both to reunify children with their parents and to terminate their parental rights so as to facilitate an adoption, so too is it impossible both to reunify children with their parents and to place the children in the custody of a relative who will become their legal guardian. Under the reasoning of *Karl H*., therefore, when a court changes a permanency plan of reunification to a concurrent plan of reunification or custody and placement with a relative for custody and guardianship, the order sufficiently "changes the terms" of an order regarding the care and custody of a child so as to become appealable under CJP § 12-303(3)(x).[3]

---

[3] Furthermore, although a concurrent plan of placement with a relative for custody and guardianship does not trigger the same strict statutory deadlines as those in a concurrent plan of adoption, the parties and the circuit court will certainly realize that this case must come to a conclusion in the not too distant future. Under CJP § 3-823(h)(4), "[e]very reasonable effort shall be made to effectuate a permanent placement for the child within 24 months after the date of initial placement." It has now been more than three years since these children were placed in shelter care and almost three years since the CINA adjudication and disposition.

15

The Department also contends that, to be immediately appealable under CJP § 12-303(3)(x), the change to the permanency plan must result in an immediate deprivation of a parent's fundamental rights. We disagree. As in *Joseph N.*, 407 Md. at 292, the concurrent goal of custody and guardianship broadens the permanency plan, to Mr. M.'s detriment. "[T]he Department's focus [is] no longer limited to making reasonable efforts to reunify [the children] with [their father]." *Id.* And the new order "ha[s] the potential to facilitate and accelerate a grant of full custody," and the power to make decisions on the children's behalf, to someone other than Mr. M. *Id.* Because the order results in a "meaningful shift in direction" in the CINA case, it is immediately appealable under the reasoning of *Joseph N. Id.*

In summary, the sole permanency plan of reunification envisioned that Mr. M. would regain custody, but the concurrent plan of custody and guardianship by a relative broadens the permanency plan by providing a secondary goal that could deprive Mr. M. of the care and custody of his children. Thus, this change to the permanency plan could ultimately deprive Mr. M. of the fundamental right to the care and custody of his children "in the future[.]" *See In re Karl H.*, 394 Md. at 430. Accordingly, we shall deny the motions to dismiss.

## QUESTIONS PRESENTED

Mr. M. presents the following questions for review, which we have modified for brevity:

1. Whether the juvenile court properly considered the statutory factors in changing the permanency plan from reunification to a concurrent plan

16

of reunification concurrent with custody and guardianship by a relative.

2. Whether the juvenile court abused its discretion in adding a concurrent plan of custody and guardianship to the existing permanency plan.[4]

For the reasons that follow, we hold that the juvenile court properly considered the factors in FL § 5-525(f)(1) in ordering a concurrent permanency plan of custody and placement with a relative for custody and guardianship.  We further hold that the juvenile court did not abuse its discretion in ordering the addition of the concurrent plan.  Thus, we shall affirm the order of the juvenile court.

## DISCUSSION

### I.   CINA Statutory Framework

When a child is declared a CINA, the Department must develop a "permanency plan" that is "consistent with the best interests of the child."  CJP § 3-823(e)(1)(i); *see In re Adoption of Jayden G.*, 433 Md. 50, 55 (2013).  The permanency plan is intended to "set[] the tone for the parties and the court" by providing "the goal toward which [they] are committed to work."  *In re Damon M.*, 362 Md. 429, 436 (2001).  "In this regard, the

---

[4] In his brief, Mr. M. presented an additional question: "Whether the court erred in finding that the Department made reasonable efforts to facilitate Father's reunification with his children during the prior review period from October of 2019 through November 5, 2020.  However, Mr. M. did not include an argument supporting this question.  Under Md. Rule 8-504(a)(6), a brief must include an "[a]rgument in support of the party's position on each issue."  "Arguments not presented in a brief . . . will not be considered on appeal."  *Klauenberg v. State*, 355 Md. 528, 552 (1999); *accord Beck v. Mangels*, 100 Md. App. 144, 149 (1994) (holding that the Court "shall not directly address" questions raised in a brief when the appellant does not "offer any substantial argument supporting his position on these specific questions"); *Monumental Life Ins. Co. v. U.S. Fidelity and Guar. Co.*, 94 Md. App. 505, 544 (1993) (holding the Court will not consider the merits of an issue when the brief "does not contain the party's argument") (emphasis omitted).

17

permanency plan is 'an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement." *In re Adoption of Jayden G.*, 433 Md. at 55 (citing *In re Damon M.*, 362 Md. at 436).

An initial permanency planning hearing, during which the juvenile court reviews or approves of a permanency plan, must be held "[n]o later than 11 months" after the child enters out-of-home placement. CJP § 3-823(b)(1)(i). The permanency plan is decided in a "descending order of priority": (1) reunification with a parent or guardian; (2) placement with a relative for adoption or custody and guardianship; (3) adoption by a nonrelative; (4) custody and guardianship by a nonrelative; or (5) another planned permanent living arrangement. CJP § 3-823(e).

The juvenile court must review the permanency plan at a review hearing "at least every 6 months" until the child is no longer committed to the Department. CJP § 3-823(h)(1)(i). At the permanency plan review hearing, the court must:

(i) Determine the continuing necessity for and appropriateness of the commitment;

(ii) Determine and document in its order whether reasonable efforts have been made to finalize the permanency plan that is in effect;

(iii) Determine the extent of progress that has been made toward alleviating or mitigating the causes necessitating commitment;

(iv) Project a reasonable date by which a child in placement may be returned home, placed in a preadoptive home, or placed under a legal guardianship;

(v) Evaluate the safety of the child and take necessary measures to protect the child;

18

**(vi)** **Change the permanency plan if a change in the permanency plan would be in the child's best interest**; and

**(vii)** For a child with a developmental disability, direct the provision of services to obtain ongoing care, if any, needed after the court's jurisdiction ends.

CJP § 3-823(h)(2)(i)-(vii) (emphasis added).

In determining the permanency plan, the court is required to consider the statutory factors set forth in FL § 5-525(f)(1) and to give "primary consideration" to the "best interests of the child[.]" CJP § 3-823(e)(2); FL § 5-525(f)(1). The Department and the juvenile court must make "[e]very reasonable effort" to permanently place the child within 24 months. CJP § 3-823(h)(4).

## II. The Juvenile Court Considered the Statutory Factors in Changing the Permanency Plan

Mr. M. argues that the juvenile court erred as a matter of law because, he says, the court did not articulate its application of the requisite statutory factors of FL § 5-525(f)(1) in changing the permanency plan.

We review changes to permanency plans under three levels of review:

> When the appellate court scrutinizes factual findings, the clearly erroneous standard . . . applies. [Secondly,] if it appears that the [juvenile court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [juvenile court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [juvenile court's] decision should be disturbed only if there has been a clear abuse of discretion.

*In re Shirley B.*, 419 Md. 1, 18 (2011) (quoting *In re Yve S.*, 373 Md. 551, 586 (2003)) (alterations in original).

19

In considering a change to a child's permanency plan, CJP § 3-823(e)(2) requires that the juvenile court consider the factors specified in FL § 5-525(f)(1):

(i)      the child's ability to be safe and healthy in the home of the child's parent;

(ii)     the child's attachment and emotional ties to the child's natural parents and siblings;

(iii)    the child's emotional attachment to the child's current caregiver and the caregiver's family;

(iv)    the length of time the child has resided with the current caregiver;

(v)     the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi)    the potential harm to the child by remaining in State custody for an excessive period of time.

FL § 5-525(f)(1)(i)-(vi).

The court must consider each specified factor and must give primary consideration to the best interests of the child. CJP § 3-823(e)(1)(i).

While the court is required to consider the "relevant statutory factors" and "make specific findings based on the evidence with respect to each of them," the court is "not required to recite the magic words of a legal test." *In re Adoption/Guardianship of Darjal C.*, 191 Md. App. 505, 531-32 (2010). "[The] mere incantation of the 'magic words' of a legal test, as an adherence to form over substance, . . . is neither required nor desired if actual consideration of the necessary legal considerations are apparent in the record." *Id.* (citing *South Easton Neighborhood Ass'n, Inc. v. Town of Easton*, 387 Md. 468, 495 (2005)).

Here, the hearing transcript confirms that the juvenile court did consider the statutory factors. At the close of the November 5, 2020, hearing, the juvenile court stated that its findings were "based upon a variety of factors." The court specifically referred to "the factors in the statute" and added that it had considered "the best interests of the children." While the court did not recite each factor, the court's explanations of its findings indicates that it had considered them.

In considering factor one, the children's ability to be "safe and healthy" in the home of Mr. M., the court explained that, while Mr. M. planned to move into his own home, he had not yet done so. The court stated that "it sounds like the place that he is talking about is suitable," but that "[h]e hasn't entered into that lease yet, he's not there yet, maybe he'll get there, maybe he'll get to a different place." Accordingly, the court factored Mr. M.'s lack of housing for the children into its decision.[5]

The juvenile court also considered factor two: the children's attachment and emotional ties with their parent. It was "clear" to the court, "that [Mr. M.] has a good relationship [with D.M. and J.M.] not only from his testimony, but from that of the Department and all the reports" that the court had seen.

The court expressed its consideration of factors three and four: the children's emotional attachment to Grandmother and her family and the extensive amount of time the children have lived with Grandmother. The court found the children to be safe and

---

[5] During oral arguments, Mr. M. implied that the Department had overlooked the option of the children living with him at his mother's home in Baltimore City. However, Mr. M. had not responded to the Department's request to complete a home assessment of that residence.

stable in Grandmother's home. The court based its finding on the testimony and the Department's reports, in which the court learned about the children's meaningful relationship with Grandmother and how the children had lived with Grandmother for a significant portion (D.M.) or all (J.M.) of their lives. In the court records, the Department had informed the court that the children were bonded with their half-brother, E.T., and with their maternal great-grandmother.

The juvenile court considered factor five: the potential emotional, developmental, and educational harm if the children moved from their current placement with Grandmother. The court observed that "there's only so much change that . . . these children can handle all at once" and that they were in a "pretty good situation right now." The court found that it would not be in the children's best interest to remove them from the stability of Grandmother's home, especially when Mr. M. had just begun making progress.

Finally, the court placed significant weight on its consideration of factor six: the potential harm of the children remaining in State custody. The court recognized that, while the pandemic had prolonged the case, Mr. M. had just recently begun to make progress towards reunification and that the case had been going on for over two years. The court expected that Mr. M. would continue to make progress towards reunification, but if he did not, a concurrent plan of custody and guardianship would prevent any further delay in providing the children with a permanent living arrangement.

Mr. M. contends that the only factors the court considered in changing the plan were the Department's contentions that Mr. M. had a positive drug test over one year ago,

22

that the Department had not received proof that Mr. M. was engaged in a substance-abuse program, and that Mr. M. had inconsistently visited the children. Therefore, Mr. M. argues, the Department failed to establish, by a preponderance of the evidence, that it was in the best interests of the children to change the permanency plan.

But, as stated above, the juvenile court did consider each of the six statutory factors, including the best interests of the children, in ordering the addition of the concurrent permanency plan. Despite Mr. M.'s claims to the contrary, the court also considered his active progress towards reunification and his commitment to maintaining his sobriety—so much so that the court found a concurrent plan of adoption was not appropriate, as he had "overcome" the past behavior that put his parental rights in jeopardy. The court acknowledged, however, that Mr. M. had just begun to make progress. Thus, the court concluded it was in the children's best interest to add a concurrent plan of placement with a relative for custody and guardianship.

## III. The Juvenile Court Acted Within its Broad Discretion in Ordering the Addition of the Concurrent Permanency Plan

Mr. M. argues that the juvenile court abused its discretion in adding the concurrent plan of placement with a relative for custody and guardianship. We discern no abuse of discretion.

In CINA cases, the juvenile court judge is given "broad statutory authority" to act in the best interest of the child. *In re Danielle B.*, 78 Md. App. 41, 68 (1989). "As a result of their broad discretionary powers, juvenile court judges have the opportunity and indeed the obligation, to act as a monitor in order to review, order, and enforce the

23

delivery of specific services and treatment for children who have been adjudicated CINA." *Id.* at 68-69. Thus, we will reverse the juvenile court's order as an abuse of discretion only if we determine the order is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *In re Shirley B.*, 419 Md. at 18-19 (citing *In re Yve S.*, 373 Md. at 583-84) (internal quotations omitted); *see North v. North*, 102 Md. App. 1, 13 (1994) (inner citations omitted) (stating that a court abuses its discretion when "no reasonable person would take the view adopted by the [trial] court" and when "the ruling is clearly against the logic and effect of facts and inferences before the court").

Mr. M. argues that the juvenile court abused its discretion in neglecting to consider the evidence of his progress and his success in overcoming impediments to reunification. Mr. M. also argues that the court abused its discretion by not considering the "hierarchy of placement options" of CJP § 3-823(e), under which reunification with a parent or guardian has the highest priority. He argues, "It is only when return of the child to the parent is not possible, for the protection or well-being of the child, that the court may consider other options." Mr. M. contends that because reunification is still possible, the juvenile court should have given primary consideration to his constitutionally protected interest as a parent.

The constitutional right of parents to raise their children without undue inference has been well established. The Court of Appeals has repeatedly affirmed that "a parent's interest in raising a child [is] so fundamental that it 'cannot be taken away unless clearly justified.'" *In re Mark M.*, 365 Md. 687, 705 (2001) (quoting *Boswell v. Boswell*, 352

24

Md. 204, 218 (1998)).  The fundamental right to raise a child, though, "is not absolute."

*Id.*  "'[W]here the fundamental right of parents to raise their children stands in the

starkest contrast to the State's effort to protect those children from unacceptable neglect

or abuse, the best interest of the child remains the ultimate governing standard.'"  *In re*

*Adoption of Jayden G.*, 433 Md. at 68 (quoting *In re Adoption/Guardianship of Rashawn*

*H.*, 402 Md. 477, 496 (2007)).  In balancing the parent's fundamental right and the

children's best interest, "the child prevails."  *Id.*

Here, the juvenile court reasonably concluded that, despite the steps Mr. M. had

taken towards reunification, it was in the children's best interests to add a concurrent plan

of placement with a relative for custody and guardianship.  The court repeatedly

acknowledged that Mr. M. had made significant progress within the past several months.

Moreover, it found that because Mr. M. had been working "very diligently to improve his

situation[,]" a concurrent permanency plan of adoption was not appropriate.

But while acknowledging Mr. M.'s parental rights, the juvenile court,

appropriately, focused its inquiry on the children, not the parent.  *See In re Adoption of*

*Ta'Niya C.*, 417 Md. 90, 116 (2010).  In doing so, the court found that the children were

thriving in Grandmother's home.  The court heard argument from the children's counsel

that, while the children have a "good relationship" with Mr. M., they "do not wish to live

with their father" because they "like living where they are."  The children's counsel

further argued that the children feel "safe and secure at their grandmother's home."  In

view of the strong and stable bond between the children and their Grandmother, as well

as their success during their placement with her, the court reasonably concluded that it

25

was in the children's best interests to add a concurrent plan of custody and guardianship by Grandmother.

Mr. M. contends that if the court had focused its inquiry on his recent progress, it would have found that continuing the permanency plan of reunification would be in the children's best interests. Thus, he argues, it was an abuse of discretion to overlook the "statutory hierarchy of placement options," which mandates that the court should first consider reunification with a parent if possible.

However, "it has been long since settled that a parent's past conduct is relevant to a consideration of his or her future conduct." *In re Dustin T.*, 93 Md. App. 726, 731 (1992). "[W]here the health and safety of [a] child is of concern, the court may look to past conduct to predict future conduct." *In re Adoption of Quintline B. & Shellariece B.*, 219 Md. App. 187, 197 (2014). "Relying upon past actions of a parent as a basis for judging present and future actions of a parent directly serves the purpose of the C.I.N.A. statute." *In re Dustin T.*, 93 Md. App. at 732.

The juvenile court had discretion to consider Mr. M.'s past conduct in concluding that a concurrent plan of reunification and placement with a relative for custody and guardianship would be in the children's best interests. It was reasonable for the court to consider that Mr. M. had not consistently cooperated with the Department, had not disclosed the identity of his employer because he did not want to pay child support, and had taken two years to begin making progress towards reunification. At the hearing, Mr. M. was newly employed and had not yet obtained a safe, healthy, hazard-free home. The court did not abuse its discretion in deciding not to draw a firm conclusion about whether

26

Mr. M.'s progress would be long-lasting, whether he would move into his proposed home, and whether he would maintain continued contact with the Department and with the children.

Finally, we conclude that the juvenile court did not abuse its discretion because the change to the permanency plan is well-aligned with the goal of achieving "a timely, permanent placement for the child consistent with the child's best interests." *See* CJP § 3-802(a)(7). D.M. and J.M. went into shelter care since March 2018. As of the November 5, 2020, hearing, they had been CINA for 28 months—well past the 24-month statutory deadline. *See* CJP § 3-823(h)(4).

Thus, the court acted within its broad discretion and in the children's best interests in ordering the addition of a concurrent plan of placement with a relative for custody and guardianship.

**MOTION TO DISMISS DENIED AND JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**