*In re I.Q.*, Consolidated Cases: Case No. 2039, September Term 2023 & No. 0741, September Term 2024. Opinion by Nazarian, J.

**APPEALABILITY – INTERLOCUTORY ORDERS – CHANGING THE TERMS OF A CUSTODY OR VISITATION ORDER**

In Child in Need of Assistance ("CINA") and Termination of Parental Rights ("TPR") proceedings, the child or local department involved in that child's care can appeal a ruling that changes the terms of a prior custody or visitation order, even if the change does not deprive the parent or guardian of the right to the care and custody of the child further. *See* Md. Code (1974, 2020 Repl. Vol.) § 12-303(3)(x) of the Courts & Judicial Proceedings Article ("CJP").

**LAW OF THE CASE – CHILD IN NEED OF ASSISTANCE AND TERMINATION OF PARENTAL RIGHTS PROCEEDINGS**

A juvenile court's rulings in a child's TPR case are not the law of the case in that child's CINA case. CINA and TPR proceedings apply different factors, serve different purposes, apply different evidentiary burdens, and follow distinct procedural pathways such that a ruling in one is not binding on the other.

**JUVENILE LAW – CHILD IN NEED OF ASSISTANCE – MODIFICATION OF PERMANENCY PLAN AND VISITATION**

The juvenile court did not abuse its discretion in changing the child's permanency plan to reunification and granting the mother unsupervised visitation. The court made findings as to the required factors in Md. Code (1999, 2019 Repl. Vol.) §§ 5-525(f)(1)(i)–(vi) and 9-101 of the Family Law Article ("FL") and concluded properly that it would be in the child's best interest to modify the custody and visitation orders.

**JUVENILE LAW – TERMINATION OF PARENTAL RIGHTS – MODIFICATION OF VISITATION**

The juvenile court did not abuse its discretion in granting the mother monthly overnight visitations during a TPR hearing in which the court held the TPR petition under advisement. The court retains fundamental jurisdiction to modify a custody or visitation order when it is in the child's best interest to do so, notwithstanding a pending CINA appeal or pending TPR petition. *See* CJP § 3-803(b)(1)(i). The court made findings as to the required factors in FL §§ 5-525(f)(1)(i)–(vi) and 9-101 and concluded properly that it would be in the child's best interest to modify the visitation order.

Circuit Court for Baltimore City
Case No. 819009004J
Case No. T21077003

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 2039, September Term 2023

and

No. 0741, September Term, 2024

CONSOLIDATED CASES

_____

IN RE I.Q.

_____

Nazarian,
Friedman,
Zic,

JJ.

_____

Opinion by Nazarian, J.
Dissenting Opinion by Zic, J.

_____

Filed: January 3, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

On January 9, 2019, three-month-old I.Q. ("I.") was hospitalized with serious injuries caused by abuse and neglect. These injuries, which remain unexplained, left I. blind permanently and at risk for developmental delays. On January 10, 2019, the Circuit Court for Baltimore City, sitting as the juvenile court, found I. to be a Child in Need of Assistance ("CINA")[1] and committed him to the Department of Social Services for Baltimore City (the "Department"). Once released from the hospital, I. was placed in a foster home for medically fragile children, where he resides to this day.

The juvenile court has held several CINA review hearings over the past five years to revisit and, in some instances, modify I.'s permanency plan and visitation schedule. The Department also initiated termination of parental rights ("TPR") proceedings in 2021 that have followed a parallel path alongside I.'s CINA case in the juvenile court. I. (sometimes the "Child") and the Department have appealed from the latest orders in the CINA and TPR cases. After determining first that the Department and the Child have the right to appeal recent orders modifying earlier custody orders, we address both sets of issues in this consolidated appeal and affirm the court's rulings in each case.

---

[1] A child in need of assistance is defined as:

> (f) . . . a child who requires court intervention because:
>
> (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
>
> (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

CJP § 3-801(f)(1)–(2).

# I.  BACKGROUND

We provided an extensive review of the facts and procedural history of I.'s CINA and TPR cases in *In re I.Q.*, No. 0108, Sept. Term 2023 (Md. App. Nov. 9, 2023). For purposes of this consolidated appeal, we recount the history briefly and pick up the cases from there.

## A.  Factual Background

### 1.  *Abuse and neglect of I*

I. was born on October 3, 2018, to Ms. H. ("Mother") and Mr. Q. ("Father"). His parents shared custody, although Mother was I.'s primary caregiver for the first three months of his life. During those three months, I. was a "happy and bubbly baby," save for a few medical concerns in November and December 2018. In early January, however, I. began showing signs of serious distress. From January 3, 2019 to January 8, 2019, he was extremely irritable and lethargic, projectile vomited and drank less milk, screamed or "screeched" whenever he was moved, and appeared cross-eyed. Despite these symptoms and I.'s maternal grandmother's recommendation that Mother take him to the hospital, neither Mother nor Father sought medical attention for him.

By January 8, 2019, I. was still irritable and vomiting and his eyes appeared "blank" and were "not moving." Mother still didn't bring I. to the hospital but left him instead with his grandmother while Mother was at work. I.'s grandmother called Mother later and suggested, for the second time, that Mother bring I. to the hospital due to his continuing symptoms. Mother scheduled an appointment with I.'s pediatrician for that afternoon and both parents attended.

At that appointment, the pediatrician observed that I.'s head was swollen and that he became irritable and cried when she touched him, especially when she touched his abdomen. The pediatrician asked Mother and Father if I. had experienced any trauma, something both parents denied. After the examination, the pediatrician told Mother and Father to "immediately take [I.] to the emergency department."

Mother and Father brought I. to the University of Maryland Medical Center, where I. was diagnosed with "subdural hematomas and abusive head trauma" as well as multiple fractures to his limbs and ribs. The medical team reported that I.'s injuries were "diagnostic of physical abuse," and sent I. to Johns Hopkins Hospital for further testing and treatment.

The medical team at Johns Hopkins described I. as "critically ill" and in need of care to "prevent cardiovascular collapse due to abusive head trauma." Once admitted to the Pediatric Care Unit, I. was diagnosed with multiple intracranial hemorrhages; multiple fractures to his ribs, legs, and arms; and "extensive multilayered retinal hemorrhages in both eyes." His fractures were in various stages of healing, which indicated that "some of them had happened earlier than others."

While the Johns Hopkins team was treating I., police officers and other staff members from Johns Hopkins and the Department asked Mother and Father to explain how I. had sustained his injuries. Both parents claimed they didn't know how the injuries happened. Father said he had dropped I. into his bassinet and may have caused the leg fractures by "rotating [I.'s] legs like a bicycle." He also admitted that he would try to "reshape" I.'s head by pressing on it, but he didn't believe he had hurt him. As to the delay in seeking medical care, Mother said she didn't think I.'s symptoms were serious.

The child abuse experts at Johns Hopkins determined that I.'s injuries were caused by "classic multi-symptom abuse . . . that could only have been caused by abusive nonaccidental traumas." One social worker noted that "[w]ithout a clear history of how [I.] sustained such extensive injury, [she was] concerned for [I.'s] safety in the care of either parent." Neither parent has definitively explained the cause of I.'s injuries since his hospitalization in January 2019.

As a result of his injuries, I. is "legally and permanently blind," suffers from a seizure disorder, and is at risk for developmental delays. Over the past five years, I. has been diagnosed with various ongoing medical and psychological issues stemming from the trauma he experienced, including autism, post-traumatic stress disorder, separation anxiety, and severe sleep issues.

### 2. *Visitation and foster care placement*

Upon release from the hospital in late January 2019, I. was placed in a foster home for medically fragile children, and he still lives there today. As part of the Department's efforts to achieve reunification—the permanency plan at the time—Mother and Father each had weekly supervised visits with I. at the Department's "Banja Center." Father, who is currently serving in the military, made some efforts to reunify with I. at first. Those efforts were inconsistent and have since ceased. Mother, however, visited consistently with I. at the Department and later in the community supervised by I.'s foster mother, Mrs. M. ("Foster Mother"). Mother and Foster Mother often coordinated extra visits as well (also supervised by Foster Mother).

Once the court modified the permanency plan to adoption by a nonrelative in June 2021, the Department began gradually providing monthly rather than weekly supervised visits, although Mother sometimes would visit, call, and FaceTime with I. in addition to the monthly visits by coordinating with Foster Mother. In early 2023, Mother asked that the Department, not Foster Mother, supervise her visits so that she could form a stronger bond with I. Under Department supervision, Mother's visits decreased to once per month.

In December 2023, the CINA court ordered a change in the permanency plan from adoption by a nonrelative to reunification and granted Mother unsupervised visitation. Mother began having unsupervised weekly visits with I. in February 2024 until May 2024, when the juvenile court expanded Mother's unsupervised visitation rights to include one weekend a month.

### B.    Procedural History

The Department placed I. in shelter care on January 9, 2019, the same day he was admitted to Johns Hopkins. The next day, January 10, 2019, the Department filed a CINA Petition with Request for Shelter Care in the Circuit Court for Baltimore City sitting as the juvenile court. The court granted the Department's petition. At an adjudicatory hearing on May 15, 2019, the court found I. to be a CINA, committed him to the Department, and granted limited guardianship to the Department.

Alongside these court proceedings, the Department completed an investigation and found both Mother and Father responsible for indicated child abuse. Mother appealed this decision; Father didn't. After two hearings in July and October of 2020, the Office of Administrative Hearings changed the finding as to Mother from indicated child abuse to

indicated child neglect for her failure to timely seek medical care for I. Mother didn't appeal that decision.

In February 2021, a magistrate recommended changing I.'s permanency plan from reunification to adoption by a nonrelative. Mother filed exceptions and the juvenile court held a hearing on June 11, 2021. The court approved the magistrate's recommendation and changed I.'s permanency plan to adoption by a nonrelative.

On March 18, 2021, the Department filed a petition to terminate Mother's parental rights. The juvenile court held a separate hearing that spanned multiple days in October and November 2022, after which the court denied the Department's TPR petition. The Child filed a motion to alter or amend the juvenile court's decision that the court denied. Both the Child and the Department noted appeals.

While the 2023 TPR appeal was pending, the juvenile court held a review hearing in I.'s CINA case that occurred over several days from July to December 2023. On November 9, 2023—while the CINA review hearing was still ongoing—this Court issued an opinion in the TPR case vacating the juvenile court's denial of the TPR petition and remanding for further proceedings. *See In re I.Q.*, No. 0108, Sept. Term 2023 (Md. App. Nov. 9, 2023). The CINA court reviewed that opinion but found that it did not establish the law of the case governing I.'s CINA matter. On December 13, 2023, the CINA court ordered a change in I.'s permanency plan back to reunification and granted Mother unsupervised visits. The Child appealed this decision. The Department initially filed a Motion for Reconsideration, but later withdrew it and filed a notice of appeal as well. This

6

CINA review hearing, and the December 13, 2023 order that followed it, are the subject of the first appeal we address in this opinion.

While the CINA appeal was pending in this Court, Mother filed a motion in the TPR case to dismiss the TPR petition or to hold it *sub curia* until the CINA appeal was resolved. The juvenile court held a hearing on May 30, 2024. The parties presented their arguments on the motion and Mother requested, for the first time, that the court expand Mother's visitation rights to include monthly overnight visits with I. The court decided to hold the TPR petition *sub curia* until this Court issued an opinion in the CINA case. The court also granted Mother's visitation request initially without hearing evidence. But then the Child and the Department suggested the court hear evidence on Mother's recent unsupervised visits with I. before making a decision. The court agreed and held a short hearing. At the end of the hearing, the court granted Mother one overnight visit per month with the condition that an Applied Behavior Analysis ("ABA") specialist (a licensed professional who provides in-home therapy for children on the autism spectrum) be present for part of the visit. Both the Child and the Department appealed, and that's the second appeal that we address in this opinion.

We include additional facts as necessary throughout the analysis.

## II. DISCUSSION

The Child and the Department raise several issues on appeal, some of which arise from the CINA court's December 13, 2023 ruling and others from the TPR court's May 30, 2024 ruling. We address first the questions presented in the CINA appeal arising from the court's decision to change I.'s permanency plan to reunification and to grant Mother

7

unsupervised visits. Then we analyze the issues raised in the second appeal arising from the court's decisions to hold the Department's TPR petition *sub curia* pending the result of the CINA appeal and to grant Mother overnight visits. But before getting to the merits of either order, we address their appealability.

## A.    The CINA Case

In their appeal from the CINA court's December 13, 2023 order, the Department and the Child raise multiple issues that we consolidate and rephrase as follows:

(1) Did the juvenile court err in concluding that our 2023 TPR opinion was not part of the law of the case in the CINA proceedings?

(2) Did collateral estoppel bar the juvenile court from reconsidering issues addressed in our 2023 TPR decision?

(3) Did the juvenile court err by scheduling and conducting a permanency plan review hearing while the first TPR appeal was pending?

(4) Did the court abuse its discretion in changing I.'s permanency plan to reunification and granting Mother unsupervised visits?[2]

---

[2] The Department phrased their Questions Presented as follows:

1.  Did the juvenile court commit legal error in concluding that this Court's guardianship opinion is "not the law of this case"?

2.  Alternatively, did collateral estoppel bar the juvenile court from reconsidering the conclusive determinations that this Court made in its guardianship decision, such as the severity of Mother's neglect, the propriety of giving Mother more time to learn how to properly care for I., and the harm I. likely will suffer if he is removed from his current placement?

3.  Did the juvenile court abuse its discretion when it granted Mother unsupervised visitation and changed I.'s permanency plan to reunification even though the evidence demonstrated that, after four years and extensive services, Mother still has

Continued . . .

8

We analyze each question in turn after considering a threshold matter on which we ordered supplemental briefing: whether the Department and the Child can appeal the challenged rulings at all.

> ### 1. The Department and the Child can appeal the CINA court's rulings under CJP § 12-303(3)(x).

At the threshold, Mother argues that the CINA court's December 13, 2023 order is not appealable by the Child or the Department. She contends that, based on the wording of Md. Code (1974, 2020 Repl. Vol.) § 12-303(3)(x) of the Courts & Judicial Proceedings Article ("CJP") and the case law defining its scope and applicability, the order must deprive Mother of the care and custody of I. or amend a previous permanency plan or visitation order to her detriment to be appealable. The Child and the Department counter that the

---

not shown that she can safely care for I.?

The Child phrased the Questions Presented as follows:

1. Did the juvenile court err in determining the November 9, 2023 opinion of this Court was not the law of the case and changing I.'s permanency plan from adoption by a non-relative to reunification after this Court held that I. deserved permanency after 4 years in care and that his permanency should not be further delayed to allow Mother to develop parenting skills?

2. Did the juvenile court err by scheduling and conducting a permanency planning review hearing in violation of CJP § 3-823(g)(2)?

3. Did the juvenile court err in awarding Mother unsupervised visitation where Mother failed to prove I. would be safe in her care?

4. Did the juvenile court err and abuse its discretion in changing I.'s permanency plan to reunification where it elevated Mother's parental interests above I.'s best interests?

plain language of CJP § 12-303(3)(x) does allow appeals from orders changing a permanency plan or visitation structure even if that change is not detrimental to the parent. They argue that cases applying CJP § 12-303(3)(x) "generally turn on whether there was a deprivation of the parent's care and custody rights" because the parents were the appellants in those cases, not because the statutory right to appeal is limited solely to parents. Finally, they argue that allowing this appeal would further the purposes of CJP § 12-303 and the CINA statutes. *See* CJP §§ 3-801–3-830. We agree with the Child and the Department that the order is appealable under CJP § 12-303(3)(x).

The Supreme Court of Maryland has addressed the appealability of CINA orders in several cases. Although the posture of this case is unusual in the sense that the Child and the Department are appealing rather than the parent, the legal principles remain the same. "Generally, appeals may be taken only from final judgments." *In re Damon M.*, 362 Md. 429, 434 (2001) (*citing* Md. Code (1974, 1998 Repl. Vol.) § 12-301 of the Courts & Judicial Proceedings Article). There are exceptions, however, to the "final judgment appealability rule," *id.*, including the interlocutory order exception under CJP § 12-303(3)(x). That statute allows interlocutory appeals from orders that deprive a parent of the care or custody of a child or, importantly, that change the terms of such an order:

> A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:
>
> * * *
>
> (3) An order:
>
> * * *

10

> (x) Depriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order . . . .

CJP § 12-303(3)(x).

Our Supreme Court has held consistently that a change to a CINA's permanency plan or visitation structure is appealable immediately under CJP § 12-303(3)(x). *See, e.g.*, *In re Damon M.*, 362 Md. at 438 (change from reunification to long-term or permanent foster care and adoption immediately appealable); *In re Yve S.*, 373 Md. 551, 583 (2003) ("[D]espite their interlocutory nature, orders of court regarding permanency plans are immediately appealable."); *In re Billy W.*, 387 Md. 405, 425–26 (2005) (order maintaining permanency plan but changing visitation structure to parents' detriment immediately appealable); *In re Karl H.*, 394 Md. 402, 430 (2006) (change from reunification to concurrent plan of reunification and adoption immediately appealable); *In re Joseph N.*, 407 Md. 278, 291 (2009) (order immediately appealable where plan remained reunification but juvenile court "shift[ed] [child's] physical custody from foster care to his father"). That much is obvious from the first half of subsection (x).

Cases analyzing the scope of CJP § 12-303(3)(x) invariably have involved appeals taken by the *parents*, which tend to highlight the detrimental change in the parents' rights to the care and custody of their children because, presumably, they're invoking the first half of subsection (x). *See, e.g.*, *In re Billy W.*, 387 Md. at 425–26 (order changing permanency plan "must act to detrimentally affect [the parents'] parental rights to be appealable"); *In re Karl H.*, 394 Md. at 430–31 (concurrent plan of reunification and adoption is "sufficiently far enough along the continuum of depriving a parent of a

fundamental right and is immediately appealable"); *In re Joseph N.*, 407 Md. at 291–92 (order maintaining reunification plan but "shifting [child's] physical custody from foster care to his father" immediately appealable by mother because it changed the plan's focus from reunification with mother to reunification with either parent).

But subsection (x) has two halves, and the second half of subsection (x) authorizes appellate review in cases where the court has "chang[ed] the terms of" a prior custody order. The text of that clause doesn't limit itself to parents. And in cases where a court changes an earlier custody order, a child and the Department could well be aggrieved by that decision.

So, did the Legislature intend to provide appellate relief under CJP § 12-303(3)(x) *only* to parents who were deprived of the care and custody of their child, or *also* to allow appeals from parties aggrieved by orders changing existing custody orders? We hold that the latter interpretation follows the plain language of CJP § 12-303 and fulfills the purposes of the CINA statute.

"As in any question of statutory interpretation, the goal is to discern and implement the intent of the Legislature." *In re O.P.*, 470 Md. 225, 255 (2020). And as always, we start with the text of the statute.[3] *Id.* Section 12-303(3)(x) states that "[a] party may appeal from . . . [a]n order . . . [d]epriving a parent, grandparent, or natural guardian of the care

---

[3] Although "[r]eview of the legislative history of the provision may help confirm conclusions drawn from the text or resolve its ambiguities," *In re O.P.*, 470 Md. at 255, there is nothing in the bill file of Senate Bill 664—the bill in which the language of CJP § 12-303(3)(x) originated—to assist in the interpretation of this section. *See* S. 664, 1975 Leg., 380th Sess. (Md. 1975).

and custody of his child, or changing the terms of such an order . . . ." CJP § 12-303(3)(x). The use of "[a] party" indicates that the right to appeal under CJP § 12-303(3)(x) is not limited to a parent but could mean *any* party to the case. *See Evans v. State*, 396 Md. 256, 341 (2006) ("Most courts have construed 'a' or 'an' as meaning 'any' and as not restricted to just one."). Both the Child and the Department indisputably are parties to the CINA case.

Interpreting CJP § 12-303(3)(x) requires a review of some common rules of grammar. To start, the second "or" in § 12-303(3)(x) is a conjunction that connects the first clause—"[d]epriving a parent, grandparent, or natural guardian of the care and custody of his child"—with the second—"changing the terms of such an order." CJP § 12-303(3)(x). The conjunctive "or" is "used as a function word to indicate an alternative." *Merriam-Webster's Collegiate Dictionary* at 872 (11th ed. 2011). When separating two alternatives—as in CJP § 12-303(3)(x)—the use of "or" signifies that one, the other, or both items is an option. *See* Bryan A. Garner, *Garner's Modern American Usage: The Authority on Grammar, Usage, and Style*, 45 (3d ed. 2009) ("If you are offered coffee or tea, you may pick either (or, in this case, neither), or you may for whatever reason order both. This is the ordinary sense of the word, understood by everyone and universally accommodated by the simple *or*."). In addition, the word "such" in the second clause— "changing the terms of *such* an order," CJP § 12-303(3)(x) (emphasis added)—is a demonstrative adjective that refers back to the type of order described in the first clause— one that "[d]epriv[es] a parent, grandparent, or natural guardian of the care and custody of his child." *Id.*; *see also* Bryan A. Garner, *Garner's Modern American Usage: The Authority on Grammar, Usage, and Style*, 783 (3d ed. 2009) ("*Such* is properly used as an adjective

13

when reference has previously been made to a category of people or things: thus *such* means 'of that kind' . . . . [S]*uch* isn't any more precise than *the*, *that*, or *those*. . . . [S]*uch* is a pointing word that must refer to a clear antecedent." (emphases in original)).

With these grammatical rules in mind, the statute breaks down logically to authorize appeals from two types of orders:

(1) An order that "[d]epriv[es] a parent, grandparent, or natural guardian of the care and custody of his child"; *or*

(2) An order that "chang[es] the terms of" a previous order that "depriv[ed] a parent, grandparent, or natural guardian of the care and custody of his child."

CJP § 12-303(3)(x).

This reading is consistent with the purposes of CJP § 12-303 and the CINA statute. Section 12-303's purpose is to avoid the "irreparable harm" a party may face if they are unable to appeal until the court issues a final judgment:

> The Legislature has seen fit to carve from the general rule of nonappealability of interlocutory orders certain specified types of orders which are immediately appealable. The common denominator of the exceptions is the irreparable harm that may be done to one party if he had to await final judgment before entering an appeal. Reversal of the final order because of the time expenditure involved in trial and appeal might "rust the sharpest sword" and "consume the strongest cord."

*Flower World of Am., Inc. v. Whittington*, 39 Md. App. 187, 192 (1978) (internal citations and footnotes omitted); *see also Della Ratta v. Dixon*, 47 Md. App. 270, 279 (1980) ("Certain types of equitable orders, if not immediately appealable, could create manifest injustice to a party.").

14

The CINA statute has several goals, but its main purpose is to protect children deemed CINA from further abuse or neglect. *See In re Rachel T.*, 77 Md. App. 20, 28 (1988) ("The purpose of a CINA proceeding is to protect children and promote their best interests."); *In re Priscilla B.*, 214 Md. App. 600, 626 (2013) ("'The purpose of [the CINA statute] is to protect children—not wait for their injury.'" (alteration in original) (*quoting In re William B.*, 73 Md. App. 68, 77–78 (1987))). Although another "key purpose of the CINA law is to 'achieve a timely, permanent placement for the child consistent with the child's best interests,'" *In re Ashley S.*, 431 Md. 678, 712 (2013) (*quoting* CJP § 3-802(a)(7)), the desire for expediency doesn't outweigh a child's safety when the court must determine whether to place them in the care of a previously abusive or neglectful parent. *See* 42 U.S.C. § 671(a)(15)(A) (federal law explaining requirements state foster care programs must meet to receive funding, including that "the child's health and safety shall be the paramount concern" in determining whether to reunify or continue foster care); *In re J.R.*, 246 Md. App. 707, 733 (2020) ("Complying with [42 U.S.C. § 671], Maryland adopted ASFA through HB1093 in 1998, asserting that this bill 'declares a legislative finding that the purpose of state adoption and guardianship law is to provide children with stable homes that protect their safety and health.'" (*quoting* Dep't Leg. Servs., *Fiscal and Policy Note (rev.)*, H.D. 1998-1093, 412 Sess., at 1 (Md. 1998))).

Normally, of course, these appeals arise in the context of parents whose custody or visitation rights have been impaired in some fashion, whose child's permanency plan has been changed from reunification to anything else, or whose efforts to regain custody or visitation or reunification have been rejected. But at least after an initial custody order has

been entered, it's certainly possible that a child or the Department might believe that a decision modifying such an order is inconsistent with the child's best interests. And that's exactly the situation here—the circuit court modified the operative visitation order to broaden Mother's unsupervised visitation with I., and both he and the Department believe that this decision places I. in jeopardy. If they were right—and we'll deal with that below—the considerations justifying an interlocutory appeal by parents when custody orders have been modified apply equally to the child themselves and to the Department as guardian. A child's safety and well-being are at stake when CINA courts rule on permanency planning, custody, and visitation. If the court's determination on whether a CINA should be reunified with their past abusive or neglectful parent or placed in that parent's unsupervised care isn't reviewable on an interlocutory basis, the child could face irreparable harm via further abuse or neglect while the child and department await the court's final decision. Concluding otherwise would go expressly against the protective goals of CJP § 12-303 and the CINA statute. *See In re Priscilla B.*, 214 Md. App. at 626 ("'[C]ourts should be most reluctant to "gamble" with an infant's future.'" (*quoting McCabe v. McCabe*, 218 Md. 378, 384 (1958))).[4]

---

[4] We recognize that another panel of this Court could be viewed as expressing, albeit indirectly, an opposing view on the Department's or a child's ability to appeal a modification order under CJP § 12-303(3)(x). In *In re O.P.*, 240 Md. App. 518 (2019), the Department and the child appealed a juvenile court's order denying the Department's request for continued shelter care. *Id.* at 545. This Court held, and our Supreme Court agreed, that the juvenile court's order was appealable under the collateral order doctrine. *Id.* at 552; *In re O.P.*, 470 Md. 225, 253 (2020). In a footnote, this Court dismissed the Department's initial argument that the order was appealable under CJP § 12-303(3)(x),

Continued . . .

16

The text and purpose of CJP § 12-303(3)(x) align, then, to authorize this appeal to proceed. *First*, the Child and the Department both are parties to the CINA case. A "party" under the CINA statute includes "a child who is the subject of a petition," and "the petitioner" that filed the CINA petition with the court. CJP §§ 3-801(u)(1)(i), (iii). I. is, of

especially in light of an earlier (but by this point moot) appeal by the Department of an order returning the child to the mother, *see id.* at 537:

> The Department originally advocated jurisdiction under § 12-303(3)(x) of the Courts and Judicial Proceedings Article, which allows an interlocutory appeal from an order "[d]epriving a parent . . . of the care and custody of his child, or changing the terms of such an order." However, that applies exclusively to orders depriving *a parent* of custody. *See In re Samone H.*, 385 Md. 282, 315–16, 869 A.2d 370 (2005) (noting that an order that does not deprive a mother of custody of her children or detrimentally change her terms of custody is not immediately appealable under § 12-303(3)(x)).

*Id.* at 552 n.12.

Although the appealing parties in *In re O.P.* and this case align, the footnote comment in that case on CJP § 12-303(3)(x) doesn't control the outcome here. Earlier in the case, the Court had heard an appeal from the Department and the child from an order modifying a pending shelter care order without analyzing the basis for appellate jurisdiction; "[u]pon further reflection and research," the Court distinguished its earlier order as grounded in CJP §§ 12-303(i) and (iii), which authorize appeals from orders granting or dissolving or refusing to grant an injunction. *Id.* And perhaps that conclusion, combined with a decision to resolve the appealability issue in *O.P.* via the collateral order doctrine, reflected some discomfort with the prospect of relying on CJP § 12-303(3)(x). But the Court didn't decline expressly to apply CJP § 12-303(3)(x) in the context of an appeal brought by the Department and the child rather than the parent or analyze the question in any depth. Instead, the Court commented briefly on the applicability of CJP § 12-303(3)(x) as it is explained in a case in which *the parent* appealed. *Id.* (citing *In re Samone H.*, 385 Md. at 315–16). Rather than assuming disapproval from between the lines, we view the Court's decision in *O.P.* not to rely on CJP § 12-303(3)(x) or to examine its applicability in that context as leaving the question open here.

17

course, the child who is the subject of the CINA petition in this case and the Department is the entity that filed the original CINA petition in the circuit court.

Simply being a party, however, is not enough. "Maryland common law is clear that, as a general rule, the only persons who may appeal a judgment are those *aggrieved* by that judgment." *Suter v. Stuckey*, 402 Md. 211, 232 (2007) (emphasis added). Here, I. has an interest in protecting his personal safety, which—from his perspective—is alleged in terms of preventing or limiting reunification or unsupervised visits with Mother. The Department also has a *parens patriae* interest in protecting the health and safety of ""those, such as minors, who cannot care for themselves."" *See In re Yve S.*, 373 Md. at 570 (*quoting In re Mark M.*, 365 Md. 687, 705 (2001)). Both took the position that it would *not* be in I.'s best interest to change the permanency plan to reunification or to allow unsupervised visits, expressing concerns about Mother's ability to care for I. and her inability or unwillingness to explain I.'s injuries. The juvenile court ultimately ordered a change in the permanency plan to reunification and granted Mother unsupervised visitation, the opposite of what the Child and the Department requested and believed to be in I.'s best interest. The Child and the Department are, therefore, aggrieved parties under the circumstances of this case.

*Second*, the December 13, 2023 order is appealable under the second portion of CJP § 12-303(3)(x), which allows interlocutory appeals of orders that "chang[e] the terms of" a previous order that "[d]epriv[ed] a parent, grandparent, or natural guardian of the care and custody of his child." CJP § 12-303(3)(x). "In determining whether an interlocutory order is appealable, in the context of custody cases, the focus should be on whether the order and the extent to which that order changes the antecedent custody order." *In re Karl*

*H.*, 394 Md. at 430. The December 13, 2023 order changed earlier custody and visitation orders that had deprived Mother of the care and custody of I. in some way. The initial CINA order, issued May 15, 2019, found I. a CINA, committed him to the Department's custody, and granted limited guardianship to the Department. On June 11, 2021, the court ordered a permanency plan of adoption by a nonrelative. All orders issued from June 2021 to December 2023 continued I.'s commitment to the Department and permanency plan of adoption by a nonrelative. By altering the permanency plan and visitation structure, the December 13, 2023 order changed the antecedent orders that had deprived Mother of I.'s care and custody. We hold, then, that the December 13, 2023 order is appealable by the Child and the Department under CJP § 12-303(3)(x).

> ### 2. Our 2023 Opinion in the TPR case was not the law of the case in the CINA case.

We turn now to the issues raised by the Child and the Department in the CINA appeal. In reviewing the CINA court's rulings, we apply "three interrelated standards of review." *In re T.K.*, 480 Md. 122, 143 (2022). We review the court's factual findings for clear error, *id.*; we review matters of law *de novo*, *id.*; and we review "[u]ltimate conclusions of law and fact, when based on 'sound legal principles' and 'factual findings that are not clearly erroneous,' . . . under an abuse of discretion standard." *Id.* (*quoting In re Yve S.*, 373 Md. at 586).

The *first* argument the Department and the Child raise is that our 2023 Opinion was the law of the case and should have governed the outcome of the TPR *and* CINA proceedings that followed. They claim the juvenile court erred by, in their view, reaching

a conclusion that contradicted the holdings in our 2023 Opinion. Mother argues that our 2023 Opinion was not the law of the case in the CINA proceedings because it pertained to a separate but related TPR case. We agree with Mother.

Under the law of the case doctrine, "[w]hen a case is appealed and remanded, the decision of the appellate court establishes the law of the case, which *must* be followed by the trial court on remand." *Tu v. State*, 336 Md. 406, 416 (1994) (*quoting* 1B J.W. Moore, J.D. Lucas & T.S. Currier, *Moore's Federal Practice* ¶ 0.404[1], at II-3 (2d ed. 1993)). This "prevents trial courts from dismissing appellate judgment and re-litigating matters already resolved by the appellate court." *Stokes v. Am. Airlines, Inc.*, 142 Md. App. 440, 446 (2002).

In determining whether the law of the case doctrine applies, we focus on whether the appellate court decided an issue "between the *same* parties in the *same* case." *Kline v. Kline*, 93 Md. App. 696, 700 (1992) (emphasis added); *see also id.* ("[A] ruling by an appellate court upon a question becomes the law of the case and is binding on the courts and litigants in further proceedings in the *same matter*." (emphasis added)). In this instance, and despite their shared guiding principle—the child's best interest—I.'s CINA and TPR proceedings are sufficiently distinct and separate that our 2023 Opinion wasn't the law of the case in I.'s CINA case.

The Maryland Supreme Court wrote extensively on the differences between TPR and CINA proceedings in *In re Adoption of Jayden G.*, 433 Md. 50 (2013). The Court noted first that the juvenile court considers different, if similar, factors in CINA and TPR proceedings. *Id.* at 75. "The CINA statute focuses on factors that mostly have to do with

20

the child's present well-being and the likely effect of a change of placement or remaining

in foster care":

> (i) the child's ability to be safe and healthy in the home of the child's parent;
>
> (ii) the child's attachment and emotional ties to the child's natural parents and siblings;
>
> (iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;
>
> (iv) the length of time the child has resided with the current caregiver;
>
> (v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and
>
> (vi) the potential harm to the child by remaining in State custody for an excessive period of time.

*Id.* at 75–76 (*quoting* Md. Code (1999, 2019 Repl. Vol.) § 5-525(f)(1)(i)–(vi) of the Family

Law Article ("FL")); *see also* CJP § 3-823(e)(2) (directing CINA court to FL §5-525(f)(1)

factors). On the other hand, the TPR statute, FL § 5-323(d), "covers a broader range of

considerations," *In re Adoption of Jayden G.*, 433 Md. at 76, and "pays particular attention

to the parent's efforts at remedying the circumstances that led to the court's intervention,"

*id.* at 77:

> (1)(i) all services offered to the parent . . . by a local department, another agency, or a professional;
>
> > (ii) the extent, nature, and timeliness of services offered . . . ; and
> >
> > (iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;
>
> (2) the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's

best interests for the child to be returned to the parent's home, including:

(i) the extent to which the parent has maintained regular contact with:

1. the child;

2. the local department . . . ; and

3. . . . the child's caregiver;

(ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;

(iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time . . . ;

(3) whether:

(i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;

(ii) 1. A. on admission to a hospital for the child's delivery, the mother tested positive for a drug as evidenced by a positive toxicology test; or

B. upon the birth of the child, the child tested positive for a drug as evidenced by a positive toxicology test; and

2. the mother refused the level of drug treatment recommended by a qualified addictions specialist . . . ;

(iii) the parent subjected the child to:

1. chronic abuse;

2. chronic and life-threatening neglect;

3. sexual abuse; or

4. torture;

(iv) the parent has been convicted . . . of:

1. a crime of violence against:

22

A. a minor offspring of the parent;

B. the child; or

C. another parent of the child; or

2. aiding or abetting, conspiring, or soliciting to commit a crime described in item 1 of this item; and

(v) the parent has involuntarily lost parental rights to a sibling of the child; and

(4)(i) the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly;

(ii) the child's adjustment to:

1. community;

2. home;

3. placement; and

4. school;

(iii) the child's feelings about severance of the parent-child relationship; and

(iv) the likely impact of terminating parental rights on the child's well-being.

FL § 5-323(d)(1)–(4).

Alongside these statutory differences, the Court explained that CINA and TPR proceedings "serve different purposes":

> CINA proceedings are designed "[t]o provide for the care, protection, safety, and mental and physical development of" children found CINA; "conserve and strengthen the child's family ties;" ensure that parents and local departments work together to "remed[y] the circumstances that required the court's intervention;" and "achieve a timely, permanent placement for the child consistent with the child's best interests." CJP § 3–802(a). In contrast, when the Department initiates TPR proceedings, it "seek[s] to terminate the existing parental relationship." [*In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 496 (2007)]. It files the TPR petition when it believes a child's welfare will be best served

in the care and custody of others, rather than the natural parents.

*In re Adoption of Jayden G.*, 433 Md. at 75. Additionally, "[d]ifferent evidentiary burdens . . . apply" in CINA and TPR cases: the "preponderance of the evidence" standard in CINA proceedings and the higher "'clear and convincing' standard of proof" in TPR proceedings. *Id.* at 77. The Maryland Rules also demand "strict application of the Maryland Rules of Evidence" in TPR proceedings, but not in CINA adjudications. *Id.*; *see also* Md. Rule 5-101(c)(5) ("[T]he court, in the interest of justice, may decline to require strict application of the [Maryland Rules of Evidence] . . . [in] [p]roceedings under Title 11 [(Juvenile Causes)] of these Rules . . . ."); *In re Ashley E.*, 158 Md. App. 144, 161 (2004), *aff'd*, 387 Md. 260 (2005) ("[I]n a permanency plan review hearing, strict application of the Maryland Rules of Evidence is not required.").

*Finally*, in rejecting the argument that reversing the change in the permanency plan would "undermine[] the footing on which the TPR proceedings st[ood]," the Court explained that "the changing of the permanency plan to adoption is not a prerequisite to the filing of a TPR petition," *In re Adoption of Jayden G.*, 433 Md. at 78 (*citing In re Adoption/Guardianship of Cross H.*, 200 Md. App. 142, 150 (2011)):

> Under the CINA and Child Welfare Services provisions, there are three ways in which TPR proceedings may be initiated. First, as in this case, the department is required to file a TPR petition after the juvenile court finds that a permanency plan of adoption by a non-relative is in the child's best interests. *See* CJP § 3-823(g). Second, FL § 5-525.1(b) requires the department to file a TPR petition when "the child has been in an out-of-home placement for 15 out of the most recent 22 months." Third, if the department "determines that adoption . . . is in the best interest of the child," it is required

24

> to "refer the case to the agency attorney," and the attorney must
> file a TPR petition. FL § 5–525.1(a).

*Id.*

So "[a]lthough 'a CINA adjudication must precede a TPR determination, it is a separate legal proceeding.' The two are governed by different statutes, serve different purposes, depend on different factors, require different standards of proof, and follow different case tracks." *Id.* at 75 (internal citations omitted). The CINA court here didn't review the same matter or issues that we reviewed in the 2023 TPR appeal. I.'s CINA and TPR cases are related but ultimately resolve separate issues, and our opinion in the TPR case is not binding in the CINA case under the law of the case doctrine.

### 3. Collateral estoppel did not bar the juvenile court from ruling on similar issues in the CINA case.

As an alternative to the law of the case argument, the Department contends that the doctrine of collateral estoppel "precluded the juvenile court from revisiting the core issues" resolved in the 2023 TPR appeal. Mother argues that the doctrine doesn't apply because the issues litigated in the CINA case are different from those that were litigated in the TPR case and appeal.[5] Mother is right, but for a different reason: we didn't reach a final judgment on the merits in the TPR appeal.

---

[5] Mother argued first that the Child and the Department didn't preserve this collateral estoppel argument for appeal. We disagree. Generally, an issue must be "raised in or decided by the trial court," to be reviewable on appeal. Md. Rule 8-131(a). "To raise an issue, a party need not discuss it at length." *Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 417 (2016). And an appellant need not use "magic words" during trial to preserve an issue for appeal properly. *Cox v. State*, 397 Md. 200, 212 (2007). What's important is

Continued . . .

Under the doctrine of collateral estoppel, also known as issue preclusion, "'[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.'" *Cosby v. Dep't of Hum. Res.*, 425 Md. 629, 639 (2012) (alteration in original) (*quoting Murray Int'l Freight Corp. v. Graham*, 315 Md. 543, 547 (1989)). "Collateral estoppel is not concerned with the legal consequences of a judgment, but only with the findings of ultimate fact, when they can be discovered, that necessarily lay behind that judgment." *Colandrea v. Wilde Lake Cmty. Ass'n*, 361 Md. 371, 391 (2000).

We apply a four-part test to determine if collateral estoppel applies:

1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?
2. Was there a final judgment on the merits?
3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?
4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

---

that the parties and the trial court had notice of the issue and that the trial court had a chance to address that issue. *See Davis v. DiPino*, 337 Md. 642, 647 (1995) ("The primary purpose of Rule 8-131(a) is to ensure fairness for all parties in a case and to promote the orderly administration of law." (cleaned up)).

The Department asked the CINA court to take judicial notice of our findings in the 2023 Opinion, arguing that the appeal "deal[t] with the exact same issues" and "[went] to the central issues of [the CINA] case." The CINA court said it would review the 2023 Opinion but would not "take judicial notice of factual findings made in that case as evidence in [the CINA] case." Although limited, this exchange represents the Department's argument that the issues decided in the 2023 appeal should not be relitigated by the CINA court and a decision from the CINA court that it would not treat the findings of the 2023 appeal as having a preclusive effect.

*Id.* Unlike the law of the case doctrine, the distinctions between TPR and CINA proceedings don't drive the collateral estoppel analysis. Instead, we focus on the *issues* the court ruled on, whether in a different context or under a different statutory scheme:

> Collateral estoppel does not require that the prior and present proceedings have the same purpose, nor does it mandate that the statutes upon which the proceedings are based have the same goals. The relevant question is whether the fact or issue was actually litigated and decided in a prior proceeding, regardless of the cause of action or claim. If the answer to that question is yes, then, assuming that the remaining factors of the doctrine have been met, collateral estoppel bars re-litigation of the issue.

*Cosby*, 425 Md. at 642 (*quoting Montgomery Cnty. Dep't of Health & Hum. Servs. v. Tamara A.*, 178 Md. App. 686, 701 (2008), *rev'd on other grounds*, 407 Md. 180 (2009)).

The collateral estoppel argument here fails on the second prong of the test—we didn't reach a final judgment on the merits of the TPR petition in our 2023 Opinion. In *In re I.Q.*, No.0108, Sept. Term 2023 (Md. App. Nov. 9, 2023), we held that the TPR court "improperly prioritized Mother's efforts over [I.'s] best interests," *id.* at 39, and failed to consider several key facts before making its findings on the FL § 5-323(d)(1)–(4) factors. *Id.* at 24–40. But we didn't make any final determinations on those factors. We highlighted the gaps in the TPR court's analyses, vacated the court's order, and remanded the case with instructions to hold a new hearing on the TPR petition. *Id.* at 44. The TPR court could come to the same conclusion as before (*i.e.*, that it's not in I.'s best interest to terminate Mother's parental rights), or it could reach the opposite conclusion. We didn't foreclose either outcome. And to the extent that the factors applied in the CINA review hearing overlap with the TPR factors, the CINA court was not bound to reach a particular conclusion after

27

our 2023 Opinion. The court was, at most, on notice that it should provide a thorough explanation for each factor and shouldn't leave out any relevant facts. As such, collateral estoppel didn't bar the CINA court from reviewing any of the issues addressed in the review hearing.

> ### 4. *The CINA court did not err when it conducted a permanency plan review hearing while the TPR appeal was pending.*

The Child argues *next* that the CINA court erred by scheduling and conducting a permanency plan review hearing because the court was required by CJP § 3-823(g)(2) to hold a TPR hearing *instead of* a CINA review hearing once the permanency plan changed to adoption by a non-relative. Mother, on the other hand, contends that the court was required under CJP § 3-823(h)(1) to hold the review hearing and didn't err in going forward with the CINA proceedings while the TPR appeal was pending. We see no error in the court's decision to proceed.

As in *In re Adoption of Jayden G.*, "[t]wo intricately connected, yet separate legal mechanisms come into play in this case": CINA review hearings and TPR proceedings. 433 Md. at 54. In CINA cases, once a juvenile court determines that a child is a CINA and sets an initial permanency plan, the court must then schedule review hearings "at least every six months until commitment is rescinded or a voluntary placement is terminated." CJP § 3-823(h)(1); *see also* CJP § 3-823(b)(1)(i) (court must hold initial permanency plan hearing within eleven months of child's commitment to department); CJP § 3-823(e)(1)-(2) (ranking permanency plans in order of priority and directing court to factors it must consider in permanency plan hearing). This is a federally mandated review process

designed to "'determine the future status of the child,'" based on the child's evolving circumstances. *In re Yve S.*, 373 Md. at 575 (*quoting* The Public Health and Welfare Act, Pub. L. No. 103-432 § 675(5)(C), 108 Stat. 4398 (1994) (amended 1997); *see also* 42 U.S.C. § 675(5)(B) (state's "case review system" must include review of "the status of each child . . . no less frequently than once every six months"). The permanency plan is at the heart of the CINA case and all efforts to achieve stability for the child:

> The permanency plan is an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement. It provides the goal toward which the parties and the court are committed to work. It sets the tone for the parties and the court and, indeed, may be outcome determinative.

*In re Damon M.*, 362 Md. at 436. As such, regular review of a CINA's permanency plan is essential to "determine progress and whether, due to historical and contemporary circumstances, [the plan] should be changed." *In re Yve S.*, 373 Md. at 582.

The default permanency plan is reunification with the child's parent or guardian. CJP § 3-823(e)(1)(i)1.; *see also In re Yve S.*, 373 Md. at 582 ("[CJP § 3-823] presumes that, unless there are compelling circumstances to the contrary, the plan should be to work toward reunification . . . ."). If, however, the juvenile court decides later to change the plan to adoption by a nonrelative, the court must order the local department to file a TPR petition within thirty days—or sixty days if the department doesn't support the change—and "[s]chedule a TPR hearing *instead of* the next 6-month review hearing." CJP § 3-823(g)(1)–(2) (emphasis added). If the court grants the TPR petition, which terminates the parent's rights and grants "a local department guardianship with the right to consent to

29

the individual's adoption," FL § 5-325(a)(3), then the CINA case is terminated. FL § 5-325(a)(4). The CINA case remains active, however, if the court denies the TPR petition, at which point the court must hold a CINA review hearing within 180 days of the order denying the petition. FL § 5-324(a)(3).

Where the juvenile court in this case decided not to grant the TPR, the CINA case remained active and the juvenile court retained jurisdiction over the CINA case. The next step in the CINA case was the scheduled six-month review hearing, as required by state and federal law. *See* CJP § 3-823(h)(1); 42 U.S.C. § 675(5)(B). Procedurally, then, the court didn't err in holding the CINA proceedings.

We also are persuaded by the CINA court's determination that going forward with the CINA proceedings wouldn't frustrate the TPR appeal:

> [THE COURT]: The Court cannot find here that proceeding with the CINA case in the trial court will frustrate in any way the purpose or the outcome of the case on appeal in the TPR -- in the TPR case. If [the TPR court's] decision on appeal is upheld denying the petition, that has no effect -- that will have no effect on the CINA case. And the CINA case outcome certainly will have no effect on what the -- on what the appellate court does with the TPR case.
>
> And in fact, if that were the scenario, any stay here of the CINA case will just result in a loss of time. If, on the other hand, the case -- the TPR case is remanded in the outcome here, the Court cannot see in any way how the outcome here in the CINA case would have any effect on the appellate court's review of the record in the TPR case. The Court will not consider what happens. The appellate court will not consider the -- this Court cannot conceive a scenario under which the appellate court would consider what happens in this proceeding in determining the appeal in the TPR case.
>
> So the TPR case is going to proceed to finality in the appellate courts regardless of what happens here. And if the outcome of

that is a remand and ultimately a granting of the TPR petition, it will render these proceedings moot, and the TPR will control. So proceeding in the -- in the CINA case will not in any way frustrate the purpose of the appeal or the outcome thereof.

. . . [T]he Court finds that it is within the best interest of the child to keep the CINA case on tract [sic] especially given that the current order in the TPR case is a denial of the petition, such that the CINA matter will proceed to finality, however that may turn out.

The court not only followed the correct statutory procedure, but also determined that holding the CINA hearing would be in I.'s best interest because proceeding would avoid unnecessary delay if we were to affirm the TPR court's denial of the petition. We find no legal error in the court's decision not to stay the CINA proceedings while the TPR appeal was pending.

> 5. *The CINA court did not commit clear error or abuse its discretion in changing I.'s permanency plan and visitation structure.*

*Finally*, the Department and the Child both argue that the CINA court relied on erroneous factual findings and abused its discretion when it changed I.'s permanency plan to reunification and authorized Mother to have unsupervised visits. Mother contends that the record provides ample support for the court's findings and that the court properly exercised its discretion in changing I.'s permanency plan and visitation schedule. We see no clear error or abuse of discretion.

In a CINA review hearing, the juvenile court must, among other things, determine whether a "change in the permanency plan would be in the child's best interest." CJP § 3-823(h)(2)(vii). Before modifying the plan, though, the court must make findings against the factors under FL § 5-525(f)(1)(i)–(vi):

31

(i) the child's ability to be safe and healthy in the home of the child's parent;

(ii) the child's attachment and emotional ties to the child's natural parents and siblings;

(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;

(iv) the length of time the child has resided with the current caregiver;

(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.

FL § 5-525(f)(1)(i)–(vi); *see also* CJP § 3-823(e)(2) (directing court to FL § 5-525(f)(1) factors for permanency plan determinations). Also, "in cases where evidence of abuse exists, courts are required by statute to *deny* custody or unsupervised visitation *unless* the court makes a specific finding that there is no likelihood of further child abuse or neglect." *In re Mark M.*, 365 Md. 687, 706 (2001); *see also* FL § 9-101(b).

The court in this case made findings relating to all the factors required by FL § 5-525(f)(1)(i)–(vi) and FL § 9-101. We review these findings for clear error, *see In re T.K.*, 480 Md. at 143, keeping in mind that a juvenile court's factual finding "'is not clearly erroneous if there is competent or material evidence in the record to support the court's conclusion.'" *In re M.H.*, 252 Md. App. 29, 45 (2021) (*quoting Lemley v. Lemley*, 109 Md. App. 620, 628 (1996)).

*First*, the court found that I. could be safe and healthy in Mother's home. *See* FL § 5-525(f)(1)(i). The court acknowledged the Child's and the Department's concerns about clutter and exposed radiators in Mother's house, but the record supports the court's

32

conclusion that these issues are "minor" and "readily correctable." In past home assessments, caseworkers made notes about "clutter," such as boxes and bins throughout Mother's house. By June 2023, though, I.'s caseworker had no concerns about clutter other than the refrigerator on the top floor, which blocked part of the hallway. Mother also testified that she has moved the bins noted as clutter in past assessments to the basement where they would be out of I.'s reach. Mother's home otherwise "passed all the basic requirements" of the Department's health assessment. Soon after that assessment, Mother reached out to the Department for assistance in finding and paying for radiator covers because she had had difficulty finding the correct size covers on her own. Taken together, the record supports the court's finding that I. can be safe and healthy in Mother's home but for a few "readily correctable" issues.

Additionally, the court found that Mother's "current lack of full understanding of how best to manage [I.'s] personality and disposition," was not detrimental to I.'s safety and that she is capable of learning how best to care for him. Although the court recognized that there is "some evidence that [Mother] struggles to control [I.] when he has tantrums," the record supports the court's finding that her "current lack of full understanding of how best to manage [I.'s] personality and disposition . . . does not unreasonably place [I.] at risk of harm." A family support worker from the Department testified that Mother was gentle with I. when he was having a tantrum. She said Mother was patient with I. and acted as his "protector" during visits. I.'s behavioral analyst also testified that she had neither heard nor seen Mother raise her voice at I. and that she has never suspected that Mother was abusing or neglecting I.

33

The court also pointed out that Foster Mother had struggled in some instances with I.'s tantrums. For example, Foster Mother testified that I. tends to communicate using physical aggression and that she's had to work with I.'s behavioral analyst to learn how to manage those situations. As I.'s former out-of-home-placement worker noted, "[i]t takes time and a lot of effort to calm [I.] down when he's having a tantrum or an outburst." So Mother isn't the only one who has difficulties dealing with I.'s behavior sometimes. Overall, the record supports the court's finding that Mother's current abilities in managing I. won't put him at risk of harm while Mother continues to improve those skills.

The record also contains sufficient evidence of Mother's coachability. According to I.'s behavioral analyst, Mother "seemed very open about receiving any feedback" and "very receptive to any commentary" regarding I.'s care. Mother was also open to regular parent training and applied the analyst's and support worker's suggestions on how to calm I. when he had an outburst. The Child points out instances in which Mother didn't follow some recommended strategies, such as wearing long shirts to practice "tailing" or saying "step" when guiding I. on stairs. But as the court explained, no two sets of parents have the exact same view on what is the "best" way to teach or parent their children, and that's not the focus of these proceedings in any event:

> [THE COURT]: . . . [T]he Court is not finding competing testimony as to the differences in [Mother's] parenting style to those of [I.'s foster parents], terribly relevant or significant with respect to the Court's ultimate determination in this case. . . . The Court will focus [its] decision in this case as the law directs on whether it's appropriate to reunify [I.] with his Mother. That, [I.'s foster parents] and [Mother] may have differences of opinions as to what is best. Grab ten sets of

parents in a room and ask them a question about what's best
for the child, you're going to get ten different answers.

The court didn't err in concluding that Mother is coachable and capable of learning how best to care for I.

*Second*, the court found that Mother had created "motherly bonds" with I. *See* FL § 5-525(f)(1)(ii). Department staff testified that Mother and I. are affectionate towards one another and that their relationship is "loving." Mother introduced several photographs showing her and I. cuddling, smiling, and playing together during visits. Caseworker testimony also indicated that Mother is "hands-on" and "very protective" of I. when he's walking around and that she tends to I.'s needs when they're together. We find no error in the court's conclusion that Mother has formed "motherly bonds" with I.

*Third*, the court found that I. is attached emotionally to his foster family. *See* FL § 5-525(f)(1)(iii). The record contains ample evidence supporting this finding. According to Foster Mother, he has a "buddy kind of relationship" with his foster father and a typical sibling relationship with the other foster child in the home. I. is "very attached" to his foster mother as well. Testimony shows that I. becomes anxious when his foster mother isn't in the room with him and Mother testified that I. would "constantly run to [Foster Mother]" during visits. Neither the Child nor the Department challenges the court's finding as to his bond with them. They argue instead that the court didn't place enough weight on this and the next two factors. As we explain below, we disagree.

*Fourth*, the court found that I. has lived with his foster family since January 2019, all but three months of his life. *See* FL § 5-525(f)(1)(iv). Nobody disputes this finding. And

35

*fifth*, the court found no evidence that I. wouldn't be able to "successfully adjust" if reunified with Mother even though his removal from his foster family "would be disruptive and present challenges for both [I.] and any new caregivers." *See* FL § 5-525(f)(1)(iv). Both the Child and the Department claim there is evidence that I. would *not* be able to adjust successfully, and they highlight the fact that he would be removed from "the only family he has ever known." The record reveals, however, that I. has adjusted to being away from his foster mother and family for long periods of time, such as for school. And with the help of a night nurse, I. wakes up in search of Foster Mother far less often than he used to. As Foster Mother admitted during her testimony, I. "is capable of being taught to separate from [Foster Mother]."

Furthermore, the fact that "children may be happier with their foster parents is not a legitimate reason to remove them from a natural parent competent to care for them in favor of a stranger." *In re Barry E.*, 107 Md. App. 206, 220 (1995). "Were bonding to be the dispositive factor, without consideration of whether a continued relationship with the biological parent would be detrimental to the best interests of the children, then reunification with a parent would be a mere chimera." *In re Adoption/Guardianship of Alonzo D.*, 412 Md. 442, 464 (2010).

The Child and the Department also take issue with the court's comment that I. will be able to adjust to reunification with Mother because "children are generally resilient." Although that sort of generalization can't, and shouldn't, be used to justify permanency plan changes, the comment here didn't reduce the court's finding to mere speculation, as the Department suggests. This ultimately reads to us less as a finding than an editorial

36

comment, and would not, in the absence of an adequately concrete record of I.'s actual adaptations and progress with Mother, support a decision to allow Mother unsupervised visits. But this record does contain sufficient evidence to support the court's findings even if we disregard this comment, which for these purposes we will.

*Sixth*, the court didn't err in "find[ing] no basis in fact to conclude that [I.] would be harmed by remaining in custody, at least within the near-term." *See* FL § 5-525(f)(1)(vi). The parties don't dispute that I. is safe and well-cared for in his current placement. Although there was some discussion about the fitness of I.'s foster parents as a long-term adoptive resource, the parties raised no concerns as to I.'s present or near-future safety. The Child claims the court failed to consider adequately the need for permanency in I.'s life when making this finding. But the court did specify that this finding goes to I.'s "near-term" future and set a reunification date for one year from the date of the order.

In addition to the FL § 5-525(f)(1) factors, the court made a FL § 9-101 finding that "it is unlikely, by a preponderance of the evidence, that abuse or neglect would reoccur if custody or visitation rights are granted to [Mother]." Both the Child and the Department challenge this finding. They claim that the court minimized the trauma that I. had suffered and ignored evidence that he would be in danger if reunified with Mother. Again, the court heard testimony about Mother's interactions with individuals involved in I.'s care who described Mother as patient, gentle, and protective when she cared for him. Department staff confirmed that Mother has completed parenting classes, domestic violence counseling, individual therapy, drug assessments, and home assessments, all successfully, and has remained almost 100% compliant with her services agreements throughout I.'s

37

CINA case. The one unmet requirement: she hasn't provided an explanation for I.'s injuries.

The Department claims the court ignored concerns about Mother sometimes becoming frustrated when working with I. Witnesses said that Mother's frustrations came across in her facial expressions or the tone of her voice. They testified, however, that Mother "was always very polite" if she became upset and needed to take a break. To their knowledge, Mother has never raised her voice at I. or harmed him physically during visits. And in explaining these moments of frustration, Mother testified that she wasn't upset with I. but rather with the situation and her lack of knowledge on how to calm I. down. Overall, the record doesn't indicate that Mother's frustrations are as "deeply concerning" as the Department suggests or, more to the point, that the circuit court erred in weighing this evidence as it did.

The Department also maintains that I. shouldn't be reunified with Mother until she explains how I. got injured when he was a baby, the one unsatisfied requirement of Mother's second service agreement. But Mother has said from the beginning that she didn't cause I.'s injuries and doesn't know for sure who did (although she thinks it must have been Father). The court listened to Mother's testimony, asked clarifying questions about the events leading up to I.'s hospitalization, and ultimately found Mother to be "sincere." When applying the clear error standard, we "give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c). The court here accepted Mother's testimony as credible, acknowledged her growth over the past five years, and

determined that her failure to seek medical attention for I. in January 2019 is not likely to happen again:

> While one can question whether it was objectively reasonable for [Mother] to have not sought medical attention sooner, the Court cannot conclude based on the evidence before it that [Mother] exercised a level of poor judgment and neglect reflecting an individual who is prone to, and might likely repeat, such decision-making in the future.

We discern no clear error in the court's FL § 9-101 finding.

*Finally*, the court applied the best interests of the child standard properly as it evaluated each of the factors. "The best interest of the child standard is the overarching consideration in all custody and visitation determinations." *Baldwin v. Baynard*, 215 Md. App. 82, 108 (2013). In CINA cases, "'unless there are compelling circumstances to the contrary, the plan should be to work toward reunification, as it is presumed that it is in the best interest of a child to be returned to his or her natural parent.'" *In re Ashley S.*, 431 Md. at 686–87 (*quoting In re Yve S.*, 373 Md. at 582).

The Child and the Department contend that the court prioritized Mother's interests and minimized I.'s. They point to the court's finding that Mother wasn't responsible for the delays in I.'s court proceedings and that the Department placed Mother in a "vicious conundrum" by requiring her to provide an explanation that she simply can't provide. These findings don't amount to an improper focus on Mother's interests, though. "[I]n most cases, 'the child's interest is inextricably linked with the parents' interest in and obligation for the welfare and health of the child. . . .'" *In re Yve S.*, 373 Md. at 572 (*quoting Parham v. J.R.*, 442 U.S. 584, 600 (1979)). But the court didn't abandon I.'s interests by

acknowledging Mother's active participation and cooperation over the years. Mother's interest in staying engaged in I.'s cases and general care bear directly on the analysis of I.'s best interests.

Having found no errors in the court's factual findings or application of the law, we hold that the court acted within its discretion when it changed I.'s permanency plan to reunification and granted Mother unsupervised visitation.

## B.     The TPR Case

In their second appeal, the Department and the Child challenge the juvenile court's decision to hold the Department's TPR petition *sub curia* and stay the TPR proceedings pending the outcome of the CINA appeal. They raise three issues:

(1) Did the TPR court violate the mandate rule when it held the Department's TPR petition *sub curia* pending the result of the CINA appeal?

(2) Did the TPR court err by holding an impromptu visitation hearing during a guardianship status hearing?

(3) Did the TPR court abuse its discretion by granting Mother overnight visits with I.?[6]

---

[6] The Department phrased their Questions Presented as follows:

1.  Did the juvenile court violate the mandate rule when it stayed the guardianship proceedings, despite this Court's instructions to resolve this guardianship case expeditiously and provide I. with the permanence he deserves?

2.  Did the juvenile court err when, during a guardianship status hearing, the court, without statutory authority, and on Mother's oral motion, increased Mother's visits to include unsupervised overnight visits?

3.  Alternatively, if the juvenile court had authority to expand

Continued . . .

40

As with the CINA appeal, we address first the issue of appealability that Mother raised in a motion to dismiss.

### 1.  *The TPR court's stay ruling is not appealable.*

Mother argues that the juvenile court's decision to hold the TPR petition *sub curia* pending the outcome of the CINA appeal is not appealable. The Child and the Department claim it is appealable as a final judgment or, in the alternative, under the collateral order doctrine. We hold that the stay order is not appealable under either doctrine.

*First*, the court's decision to hold the TPR petition *sub curia* isn't a final judgment. "For the trial court's ruling to be a final judgment it must either determine and conclude the rights of the parties involved *or* deny a party the means to 'prosecut[e] or defend[] his or her rights and interests in the subject matter of the proceeding.'" *In re Samone H.*, 385

---

visitation, did the court abuse its discretion by applying the wrong burden of proof and by failing to consider all the relevant evidence?

The Child phrased their Questions Presented as follows:

1. Did the juvenile court err by refusing to hold a hearing on the Petition in compliance with the Mandate and Opinion of the Appellate Court of Maryland, which directed that I. should no longer continue to be in "legal limbo"?

2. Did the juvenile court err by holding a visitation hearing during a guardianship hearing where the court did not grant or deny the Petition, the issue of Mother's visitation was on appeal in the [sic] I.'s CINA case, and I. and the Department had no notice of Mother's request for expanded visitation?

3. Did the juvenile court abuse its discretion by expanding Mother's visitation with I., where Mother refused to work with the ABA therapist during visits and I.'s school performance declined when unsupervised visits started?

Md. 282, 297–98 (2005) (emphasis added) (*quoting Rohrbeck v. Rohrbeck*, 318 Md. 28, 41 (1989)). The juvenile court's stay order in this case didn't resolve the underlying dispute between the parties conclusively (*i.e.*, whether Mother's parental rights should be terminated). So the order must "deny a party the means to 'prosecut[e] or defend[] his or her rights and interests in the subject matter of the proceeding'" to constitute an appealable final order. *Id.* (*quoting Rohrbeck*, 318 Md. at 41).

An order that doesn't "settle the underlying dispute between the parties," *In re Billy W.*, 386 Md. 675, 689 (2005), may nonetheless be an appealable final judgment if it "has the effect of put[ting] the [party] out of court." *Metro Main. Sys. South, Inc. v. Milburn*, 442 Md. 289, 299 (2015) (*quoting McCormick v. St. Francis de Sales Church*, 219 Md. 422, 427 (1959)). Although the TPR court's stay order did place the parties out of court for a time, a temporary postponement doesn't fall within this second form of finality.

An order that terminates the action and places the parties out of court indefinitely, such as an order dismissing a complaint without prejudice, is an appealable final judgment. *Moore v. Pomory*, 329 Md. 428, 431–32 (1993). But an order that places the parties out of court *temporarily* but doesn't dispose of the case, such as an order dismissing a complaint but granting leave to file an amended complaint, is not an appealable final judgment because it keeps the case "pending in the trial court . . . until another order is entered disposing of the case." *Id.* at 431. Thus, due to the temporary nature of stay orders, "a trial court's decision on a motion for a postponement, continuance, or stay is ordinarily not appealable." *County Comm'rs of Frederick Cnty. v. Schrodel*, 320 Md. 202, 213 (1990).

The Child and the Department rely on *Monarch Academy Baltimore Campus, Inc. v. Baltimore City Board of School Commissioners*, 457 Md. 1 (2017), to argue that the stay order here is appealable because it will put them out of court for an unreasonable amount of time. In *Monarch*, the Court held that the trial court's order staying the proceedings so that a party could bring their claim before an administrative agency was an appealable final judgment due to the "unique circumstances of [that] case," even though such orders will typically "only **temporarily** put a party 'out of court.'" *Id.* at 49. Two key factors in the Court's analysis included the lack of instruction from the court about what the parties needed to do to resume the court proceedings, coupled with no "clear procedural mechanism through which" the party could bring their claim before the administrative agency, *id.* at 50, and the potentially "indefinite and protracted" administrative proceedings the parties would have to endure before they could resume court proceedings. *Id.* at 53.

In this instance, the juvenile court stayed the guardianship proceedings "pending the appeal of [the CINA court's] decision to change the [permanency] plan from adoption to reunification." At the end of the TPR hearing, the parties and the court discussed having a status conference around when they expected this Court to issue a decision in the CINA appeal to set a date for a new TPR hearing:

> [THE COURT]: Thank you.
>
> Is there anything else Counsel? Do we need to schedule another hearing or I'm going to wait until I hear from the appellate court?

> [COUNSEL FOR MOTHER]: As [Department's counsel] noted, oral argument is scheduled for September.[7] The [Appellate] Court has to make a decision within 60 days of oral argument. So I don't anticipate an order being issued until early November, Your Honor.
>
> [THE COURT]: Okay. I will wait to hear from counsel so that I can schedule if I need to another TPR hearing.
>
> [COUNSEL FOR CHILD]: Your Honor, I was just going to suggest that perhaps a virtual status conference in mid-November just because—
>
> [THE COURT]: That sounds—
>
> [COUNSEL FOR CHILD]: —it took a while to get before the Court today given Your Honor's assignments so to another court, and maybe a virtual status conference in the middle of November and then we can pick a further date if needed.
>
> [THE COURT]: That's fine. Would you reach out to [court staff] and we'll set up a virtual hearing date to find the status. And I know my next year, I'm going to still be in civil and criminal, but when I have to come back down I'll just, you just let me know the date and we'll figure a date for me to come, and if I need to for a TPR hearing.

Unlike the indefinite stay of the proceedings in *Monarch*, the stay postponed the proceedings temporarily until this Court issues its decision in the CINA appeal, which would occur within six or seven months of the May 30, 2024 TPR hearing. The parties knew what they needed to do to resume proceedings in the juvenile court (*i.e.*, await the resolution of the CINA appeal and reach out to chambers staff to schedule a status conference for mid-November), and didn't have to jump through administrative hoops to get there, as the parties in *Monarch* did. *Id.* at 50. The stay order is not a final judgment,

---

[7] Due to the consolidation of the CINA and TPR appeals, oral argument was later rescheduled to October 7, 2024.

44

then, but an interlocutory order that must fall under an exception to the final judgment rule to be appealable.

*Second*, the stay order isn't appealable under the collateral order doctrine. This doctrine allows parties to appeal from a collateral order—an order that *isn't* final—when the order "(1) conclusively determines the disputed question, (2) resolves an important issue, (3) resolves an issue that is completely separate from the merits of the action, *and* (4) would be effectively unreviewable if the appeal had to await the entry of a final judgment." *Pittsburgh Corning v. James*, 353 Md. 657, 661 (1999). An order must satisfy all four elements to be appealable under this "limited exception" to the final judgment rule. *Ehrlich v. Grove*, 396 Md. 550, 563 (2007).

Although the collateral order doctrine is restricted to "extraordinary circumstances," *County Comm'rs for St. Mary's Cnty. v. Lacer*, 393 Md. 415, 428 (2006) (*quoting In re Foley*, 373 Md. 627, 634 (2003)), not something as common as postponements, our Supreme Court has found that certain stay orders can be appealable under this doctrine. *Schrodel*, 320 Md. at 214. In *Schrodel*, the County filed a condemnation petition to take a portion of the Schrodels' land to use for a new county landfill. *Id.* at 204. The Schrodels later filed a second suit to enjoin the condemnation trial and moved to stay the trial. *Id.* The circuit court granted the stay, postponing the proceedings unless and until the County obtained an updated permit to operate the new landfill. *Id.* at 206–07. The County appealed and claimed the stay order was improper. *Id.* at 208–09. Before reaching the merits, the Supreme Court analyzed whether the stay order—an interlocutory order—was appealable under the collateral order doctrine:

45

> First, the order conclusively determined that the County must wait until it receives a permit from the Maryland Department of the Environment before it can go to trial with its condemnation action. Second, the issue of whether a court can lawfully impose such a condition on the government's power to acquire property by condemnation is clearly important. Many essential public projects begin with a taking of land and require various permits before completion.
>
> Third, the question of whether the County can be required to obtain the permit before having a trial is obviously distinct from the trial itself. . . .
>
> Fourth, if not appealable until the trial's conclusion, the claim that the County's right to condemn cannot be conditioned on first obtaining all necessary permits would irretrievably be lost. The government already will have had to comply with a possibly unlawful condition. If the County were to get the permit, it would take the property after a trial on value only, and the issue of whether the court could impose the condition would be moot on appeal.

*Id.* at 212. The Court found the stay order appealable under the collateral order doctrine but warned that their "'holding concerning appealability goes no further than the circumstances presented in this case.'" *Id.* at 214 (*quoting Public Serv. Comm'n v. Patuxent Valley*, 300 Md. 200, 210 (1984)).

The circumstances of this case are different. The court in *Schrodel* "impose[d] . . . a condition on the government's power to acquire property by condemnation" when it ordered the County to obtain a permit as a condition of continuing its case in court. 320 Md. at 212. Because condemnation proceedings are a common means of initiating "essential public projects," *id.*, the stay order prevented the County from carrying out "[a]n important government prerogative." *Id.* at 214. The court also noted the length of the stay

(at least eighteen months) and the fact that if the County failed to get the permit, it would never have its condemnation trial. *Id.*

Although achieving permanency for I. is important in this case, the guardianship proceedings are not "essential" to achieving that permanency. I. could achieve reunification with Mother through the CINA case without the juvenile court ever ruling on the TPR petition. Plus the six-month delay created by the stay order here is much shorter than the eighteen months in *Schrodel*—the parties knew they'd be back in the juvenile court before the end of the year. *Id.* at 214. And unlike in *Schrodel*, there was no question about whether the parties would have their TPR hearing—our decision in the CINA appeal wouldn't terminate or otherwise prevent the TPR proceedings from happening. Thus, the TPR court's stay order isn't appealable, and we cannot address the merits of that decision.

> 2.     The TPR court's visitation ruling is appealable under
> § 12-303(3)(x).

Mother's argument against the appealability of the TPR court's visitation order mirrors her argument against the appealability of the CINA court's ruling: the ruling didn't "depriv[e] [Mother] of the care and custody of [I.]," she says, so it's not appealable under § 12-303(3)(x). *See* CJP § 12-303(3)(x). As explained above, *see* Subsection II.A.1, though, § 12-303(3)(x) allows the Child and the Department to appeal the CINA court's ruling because the appealed order changed the earlier custody order even though it didn't deprive Mother of the care and custody of I. further. That same analysis applies here.

Again, CJP § 12-303(3)(x) allows a party to appeal an order that "chang[es] the terms of" a previous order that "depriv[ed] a parent, grandparent, or natural guardian of the

47

care and custody of his child." CJP § 12-303(3)(x). In light of the plain language and purpose of § 12-303(3)(x), the order facing appeal need not have had a further detrimental effect on the parent's custody or visitation rights to be appealable.

Here, the Child and the Department are parties to the TPR case. A "party" under the guardianship statute includes "the child," and "the local department to which the child is committed." FL § 5-301(h)(1)(i), (iii). I. is the child who is the subject of the guardianship petition in this case, and the Department is the entity to which I. is committed. Both are aggrieved parties as well. The Child and the Department both opposed the expansion of visitation to overnight visits, arguing that it would not be in I.'s best interest. The court ultimately ruled against them and granted Mother's request.

The TPR court's visitation order satisfies § 12-303(3)(x). The order expanded Mother's visitation rights, which had been limited to weekly unsupervised visits under the CINA court's December 13, 2023 order. Mother's rights to care and custody of I. remained restricted to those guidelines which, despite the intentional lack of a maximum time limit on visits, didn't permit overnight visits. The change makes the TPR court's order appealable under CJP § 12-303(3)(x).

> 3. *The court didn't err in holding a visitation hearing during the motions hearing.*

The Child and the Department argue next that the TPR court erred when it granted Mother overnight visits because (1) the TPR court did not have jurisdiction to enter a visitation order without ruling first on the TPR petition; (2) the court ruled improperly on visitation matters that were the subject of the pending CINA appeal; and (3) addressing

48

visitation on Mother's oral motion after the hearing commenced prejudiced the Child and the Department. We disagree with the first two contentions and don't reach the merits of the third.

*First*, the Child and the Department argue that FL § 5-324 limits the juvenile court's jurisdiction in TPR proceedings so that the court may only set visitation if it grants the TPR petition. *See* FL § 5-324(b)(ii)(5) ("In a separate order accompanying an order granting guardianship of a child, a juvenile court . . . may allow visitation for the child with a specific individual."). But CJP § 3-803 grants a juvenile court exclusive jurisdiction over all "[p]roceedings arising from a petition alleging that a child is a CINA," CJP § 3-803(a)(2), and concurrent jurisdiction over the "[c]ustody, visitation, support, and paternity of a child whom the court finds to be a CINA." CJP § 3-803(b)(1)(i). The permissive provision in FL § 5-324(b)(ii)(5) doesn't negate the juvenile court's fundamental jurisdiction over visitation matters under CJP § 3-803.

Moreover, and although the Supreme Court has noted the importance of separating CINA proceedings (which are designed to provide for the care, protection, safety, and mental and physical development of the child) from TPR proceedings (which are designed to determine whether a parent is unfit or if exceptional circumstances exist that make a continued parental relationship detrimental to the best interests of the child), the Court has acknowledged that the juvenile court has the authority to address both in a single hearing:

> [E]ven though the juvenile court certainly had the authority to alter the CINA child's permanency plan during a TPR hearing, a best practice for juvenile courts is to separate the proceedings into two hearings. . . . This is optimal because a CINA

49

permanency hearing and a TPR hearing are seeking to resolve related, but, ultimately distinct issues.

*In re Adoption/Guardianship of C.E.*, 464 Md. 26, 64 (2019). So, although we echo the Court's warning that this isn't the preferred course and emphasize that the juvenile court's orders should be tied to the objective of the respective proceedings, it nonetheless was permissible for the court to consider a visitation request during a TPR proceeding. *Id.*

In short, a juvenile court has jurisdiction to consider visitation requests even if it doesn't rule first on a pending TPR petition. "[I]n the absence of a stay [issued by the appellate court], trial courts retain fundamental jurisdiction over a matter despite the pendency of an appeal." *Kent Island, LLC v. DiNapoli*, 430 Md. 348, 360–61 (2013). The juvenile court can, therefore, continue to deal with matters within its fundamental jurisdiction, including visitation, while an appeal is pending in the same case. *Id.* at 361.

The Child and the Department argue *next* that the TPR court was prohibited from ruling on Mother's visitation rights because it was the subject of the pending CINA appeal. We hold that the modification was permissible under these circumstances.

Although the juvenile court retains its fundamental jurisdiction while an appeal is pending, the court can't "exercise its jurisdiction in a manner affecting the subject matter or justiciability of the appeal." *Id.* at 361; *see also Jackson v. State*, 358 Md. 612, 620 (2000) (A trial court can't exercise its jurisdiction in a way that "precludes or hampers the appellate court from acting on the matter before it."). For example, in *In re Emiliegh F.*, 355 Md. 198 (1999), the Supreme Court held that a juvenile court couldn't terminate the CINA case while a prior custody order from that CINA case was on appeal. *Id.* at 204. By

doing so, the juvenile court would "usurp[] . . . the role properly reserved to the appellate court, *i.e.* to decide the issues raised by the appellant in the interlocutory appeal," *In re Joseph N.*, 407 Md. 278, 303 (2009) (*citing In re Emileigh F.*, 355 Md. at 202–03), which would "defeat the right of [the appellant] to prosecute [their] appeal with effect." *In re Emileigh F.*, 355 Md. at 204.

There's a difference, though, between a "[p]rohibited action by the trial court that defeats the right of a party to prosecute an appeal," as in *In re Emileigh F.*, and a "permitted action by the trial court that renders a case moot." *In re Deontay J.*, 408 Md. 152, 163 (2008). In *In re Deontay J.*, for example, the Supreme Court held that the juvenile court can modify the terms of a custody order in a CINA case while that custody order is on appeal, even if the modification renders the appeal moot, because "[t]he Circuit Court has a duty to modify a custody order when persuaded that a modification is necessary to protect the health, safety and well-being of a CINA." *Id.* at 164; *see also In re Adoption of Jayden G.*, 433 Md. at 74 (court can terminate parental rights while permanency plan is on appeal because statute authorizes court to rule on TPR petition within 180 days of its filing).

This case, although it involves visitation rather than custody, is comparable. The juvenile court modified I.'s visitation structure while the CINA court's latest order granting unsupervised visitation was on appeal, just as the juvenile court in *In re Deontay* adjusted the child's custody plan while the court's latest custody order was on appeal. 408 Md. at 162. Although the juvenile courts' actions in both instances addressed issues that were the subject of pending appeals, the court's duty to modify a CINA's plan of custody, or in this case visitation, when it's in the child's best interest to do so "is not affected by the pendency

51

of an appeal, or by the fact that the next periodic review hearing is not scheduled to be held for several months." *Id.* at 164.

And although such actions are permissible even when they render a pending appeal moot, *id.*, the juvenile court's visitation order in this case didn't render the CINA appeal moot. The controversy in the CINA appeal is alive because the TPR court "may have been influenced by an error made in the [CINA] order." *In re Joseph N.*, 407 Md. at 304. As such, the TPR court didn't err in modifying I.'s visitation plan (at least so long as there was no abuse of discretion, as we will discuss in the next Section), nor did it render the CINA appeal moot.

*Finally*, the Child argues that the TPR court's decision to go forward with the impromptu visitation hearing prejudiced to the Child and the Department because they had no notice of Mother's request and therefore had no time to prepare for such a hearing. This issue, however, was not preserved for appellate review.

Under Md. Rule 8-131(a), an issue must be "raised in or decided by the trial court," to be reviewable on appeal. Md. Rule 8-131(a). "The primary purpose of Rule 8-131(a) is to ensure fairness for all parties in a case and to promote the orderly administration of law." *Davis v. DiPino*, 337 Md. 642, 647 (1995) (cleaned up). Generally, to "provid[e] fairness to the parties . . . 'counsel [must] bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.'" *Id.* at 648 (*quoting Clayman v. Prince George's Cnty.*, 266 Md. 409, 416 (1972)). At a minimum, the appellant must "make a reference to" the issue during trial. *Brock v. State*, 203 Md. App. 245, 270 (2012) (appellant preserved issue of using evidence

for impeachment purposes when appellant made single reference to impeachment while presenting an argument centered on hearsay).

Mother raised her request for overnight visits after the court heard argument on whether to dismiss or hold the TPR petition *sub curia*. The court granted the request initially after hearing Mother's short supporting proffer. The Child then asked the court to hear evidence before ruling on visitation:

> [COUNSEL FOR CHILD]: So, I think if Your Honor is going to make decisions about visitation then there needs to be evidence that's being based off of her proffer by Mother's counsel.
>
> [THE COURT]: Well, it's my understanding that [the CINA court] made the minimum amount, said the minimum was three hours. [The CINA court] didn't limit it to that. The Department—well, Counsel, you're absolutely right. Maybe I should hear evidence about that. I'll hear from Counsel on that.

The Department told the court that they were prepared to provide evidence on recent visits, and the Child said nothing about how prepared he was (or wasn't):

> [COUNSEL FOR DEPARTMENT]: Your Honor, with respect to making a 9-101(b) finding, the Court's going to need to hear evidence as to the nature of the visits and how they're going, the length of time, all of those things. So the Department is, the Department would be prepared to present evidence regarding the visits. If the Court is so inclined to expand them to overnights, then that's the Court's decision.
>
> [THE COURT]: I would like to hear evidence. Thank you. Could you call your first witness?
>
> [COUNSEL FOR MOTHER]: From me, Your Honor?
>
> [THE COURT]: Yep. Yes.
>
> [COUNSEL FOR MOTHER]: Okay. . . .

So although the parties raised and discussed the issue of evidence, only the Department brought up their preparedness, and they said they were ready to go forward with the visitation hearing using the evidence they prepared for the TPR hearing. The Child raised no objection relating to his ability to present evidence, nor did he object to the court continuing with the hearing once it decided to hear evidence on visitation. The question of prejudice, then, is not properly before us.

> 4. *The TPR court's factual findings were not clearly erroneous, and the court did not abuse its discretion in granting Mother monthly overnight visits.*

*Finally*, the Child and the Department argue that the TPR court abused its discretion when it granted Mother monthly overnight visitation. Specifically, the Child claims the "evidence was insufficient to support Mother's request for expanded visitation," and the Department claims that the court placed the burden of proof improperly on the Child and the Department and failed to consider all relevant evidence. We disagree.

Before expanding Mother's visitation rights, the juvenile court made the required FL § 9-101 finding and concluded the modification would be in I.'s best interest:

> [THE COURT]: I'm going to find, make a 9-101 finding that is in the best interest of I. that visitation be extended. There is no evidence that I. has been in harm with the Mother and with the visitation or in the future would be in harm. There was no testimony from [I.'s caseworker] that he found extending visitations would not be in the best interest of I. I heard evidence for many hours, years ago, about I. and his behavioral issues at school with the foster care mother. Whoever is with I. is going to have issues. So I am going to grant the extended visitation.

The record supports these findings. I.'s caseworker testified that after a successful home assessment in February 2024, Mother and I. had unsupervised visits at Mother's home once a week for at least three hours at a time. Mother addressed minor safety hazards that caseworkers had brought to her attention (*i.e.*, she put covers on the radiators and got a baby gate), and acquired a separate bed for I. He also confirmed that even accounting for one visit that ended early, he had no reason to ask the court to stop the unsupervised visits.

The parties asked several questions during the hearing about an April 2024 visit that ended earlier than planned. The Child and the Department emphasized I.'s aggressive behaviors during that visit (*i.e.*, trying to bite Mother and allegedly breaking Mother's glasses), and the fact that Mother called Foster Mother to have I. picked up early. Mother explained during her testimony, however, that I.'s aggressive behaviors had nothing to do with the visit ending early. Rather, Mother brought I. to the drop-off point thirty minutes earlier than planned because the zoo—where I. had just spent several hours with Mother and his grandmother—was closing. She handled I.'s aggressive behaviors with some "redirection" and by giving him a snack, which calmed him down. She also stated that I. is not usually aggressive during visits in her home.

Although Mother declined the Department's offer to have I.'s former ABA specialist present during visits because she "didn't really work well with [the specialist]," Mother testified that she wants her own specialist to work with her during visits. Indeed, the court made it a condition of the overnight visits that an ABA specialist be present part of the time to provide training and help manage I.'s aggressive behaviors. Additionally, while I. continues to engage in the "same aggressive behavior" at school, there is no

evidence to support a causal link between the unsupervised visits and I.'s behavior or performance at school.

As for the Department's argument that the court placed the burden of proof improperly on the Child and the Department, we see no such error in the court's ruling. When a court sets out to make a finding under FL § 9-101, "[t]he burden is on the parent previously having been found to have abused or neglected his or her child to adduce evidence and persuade the court to make the requisite finding under § 9-101(b)." *In re Yve S.*, 373 Md. at 587. Mother provided sufficient evidence to meet this burden. She addressed the few remaining safety concerns in her home and passed a home assessment before the unsupervised visits began. She was able to redirect and manage I.'s aggressive behaviors during a visit out in the community. And I.'s caseworker testified that he hasn't found it necessary to request termination of unsupervised visitation, the inference being that the visits have gone well enough to continue unsupervised visitation. In sum, we find no error or abuse of discretion in the juvenile court's findings or rulings.

\* \* \*

We hold that neither the CINA court nor the TPR court abused their discretion in their respective rulings. The court's December 13, 2023 order and the visitation ruling of the May 30, 2024 order are appealable, and we affirm them both.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANTS TO PAY COSTS.**

56

Circuit Court for Baltimore City
Case No. 819009004J
Case No. T21077003

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 2039, September Term 2023

and

No. 0741, September Term, 2024

CONSOLIDATED CASES

_____

IN RE I.Q.

_____

Nazarian,
Friedman,
Zic,

JJ.

_____

Dissenting Opinion by Zic, J.

_____

Filed: January 3, 2025

The Majority asks, "So did the Legislature intend to provide appellate relief under CJP § 12-303(3)(x)[1] *only* to parents who were deprived of the care and custody of their child, or *also* to allow appeals from parties aggrieved by orders changing existing custody orders?" *In re I.Q.*, Nos. 2039, 0741, slip op. at 12 (Md. App. Dec. __, 2024). As I read the controlling case law, from the Supreme Court of Maryland and this Court, interpreting CJP § 12-303(3)(x), that question should be answered by either the Supreme Court of Maryland and/or the Maryland General Assembly. It is on this issue of appealability that I disagree with the conclusion of the Majority and must dissent. I would hold that the December 2023 and the May 2024 orders are not appealable under any of the recognized exceptions to the final judgment rule and, therefore, would not reach the merits of the case.

CJP § 12-303(3)(x) provides a statutory exception to the final judgment rule for interlocutory orders "[d]epriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order[.]" In light of the case law outlined below, I do not agree with the Majority's reading of this statutory language. I am not persuaded that the identity of the appellant—whether it be a parent, a child, or the Department—changes the analysis.[2]

_____

[1] Md. Code Ann., Courts and Judicial Proceedings ("CJP") § 12-303(3)(x) (1973, 2020 Repl. Vol.)

[2] The Department previously advocated for appellate jurisdiction under § 12-303(3)(x) in *In re O.P.* and this Court stated that the statute "applies exclusively to orders depriving *a parent* of custody." 240 Md. App. 518, 552 n.12 (2019) (citing

Continued . . .

The Supreme Court of Maryland has repeatedly held that "to be appealable in CINA cases involving the biological parent and the State, a court order must operate to deprive a parent of the care and custody of his or her child, *or change the terms of custody to the parent's detriment*." *In re Billy W.*, 386 Md. 675, 693 (2005) (emphasis added); s*ee also In re Joseph N.*, 407 Md. 278, 291 (2009) ("The question we must answer [on] appeal is whether the court's [] order effectuated a detrimental change to [parent's] custody rights falling within Section 12-303(3)(x)."); *In re Samone H.*, 385 Md. 282, 299 (2005) ("To be appealable under Section 12-303[(3)](x), an order denying a motion for independent study either must operate to deprive [mother] of the care and custody of [her children] or change the terms of her care and custody of the children.").

When a court order amends a permanency plan and changes that plan from reunification to foster care or adoption, the court's order is an immediately appealable interlocutory order. *In re Damon M.,* 362 Md. 429, 438 (2001). In addition, "orders that effectively broaden a permanency plan to a parent's detriment are immediately appealable under CJP § 12-303(3)(x)." *In re D.M.*, 250 Md. App. 541, 556 (2021) (citing *In re Joseph N.*, 407 Md. at 291).

The Supreme Court of Maryland addressed the appealability of concurrent permanency plans in *In re Karl H.*, 394 Md. 402, 430 (2006): "We hold that a concurrent permanency plan that includes the option of adoption is sufficiently far enough along the

---

*In re Samone H.*, 385 Md. 282, 315-16 (2005). The Supreme Court of Maryland affirmed in part and reversed in part but did not address appealability under § 12-303(3)(x). 470 Md. 225 (2020).

continuum of depriving a parent of a fundamental right and is immediately appealable." *See also In re D.M.*, 250 Md. App. at 558-59 ("[W]hen a court changes a permanency plan of reunification to a concurrent plan of reunification or custody and placement with a relative for custody and guardianship, the order sufficiently 'changes the terms' of an order regarding the care and custody of a child so as to become appealable under CJP § 12-303(3)(x).").

In *In re Joseph N.*, the juvenile court reaffirmed the permanency plan of reunification and moved the child from foster care into the care and custody of the father. 407 Md. at 291-92. The Supreme Court of Maryland applied the second half of § 12-303(3)(x) and concluded that the order "was a pivotal change in the direction of [mother's] permanent loss of custody because it set the stage for the court's dismissal of [the] CINA case and an award of full custody in favor of [father.]" *Id.* at 294. The Court held that the mother "possessed the right to maintain an interlocutory appeal[.]" *Id.* at 295.

"[W]hen a CINA order does not 'adversely affect' the parent's parental rights or 'change the permanency plan terms to [the parent's] increased detriment[,]' the order is not appealable under CJP § 12-303(3)(x)." *In re D.M.*, 250 Md. App. at 557 (quoting *In re Samone H.*, 385 Md. at 316-17 (holding that the denial of mother's motion for a bonding study was not an appealable interlocutory order under § 12-303(3)(x))). *See also In re Katerine L.*, 220 Md. App. 426, 440 (2014) ("The order denying [the putative father's] request for genetic testing did not change the antecedent custody order as to [the

3

children], nor did it *adversely* affect [the putative father's] right to the care and custody of [the children.]").

The Court, specifically addressing the appealability of visitation changes, held that orders that "maintained the extant [permanency] plans for the children but changed visitation" are only appealable under § 12-303(3)(x) if the orders "act to detrimentally affect" parental rights. *In re Billy W.*, 387 Md. 405, 425-26 (2005) (Orders changing "partial weekly unsupervised visitation to total weekly unsupervised visitation . . . do[] not operate to [mother's] detriment because she is allowed more unrestricted access" and are not appealable, whereas orders that eliminate unsupervised visitation are detrimental to mother and are appealable.).

In order to fall within the bounds of § 12-303(3)(x), the orders in this case must have "effectuated a detrimental change" to Mother's rights. *In re Joseph N.*, 407 Md. at 291. The December 2023 Order does change the antecedent custody order, as Appellants argue. The court changed I.'s permanency plan from adoption by a non-relative to reunification with Mother. This change is the opposite of the appealable change made in *In re Damon M.* as it increases Mother's custody rights. The December 2023 Order also granted Mother unsupervised visitation, whereas Mother previously had only supervised visitation. The May 2024 Order further expanded Mother's visitation rights by allowing monthly overnight visits. These changes are comparable to the changes to visitation in *In re Billy W.*, 387 Md. at 426, where the changes granting mother "more unrestricted access" were not appealable. The changes to the permanency plan and the visitation rulings here do not adversely affect Mother's rights to the care and custody of I. Neither

4

the December 2023 Order nor the May 2024 Order "change the terms of custody to the parent's detriment" and, therefore, are not appealable interlocutory orders under § 12-303(3)(x). *In re Billy W.*, 386 Md. at 693.

Appellants further argue that the court's visitation rulings are appealable under the collateral order doctrine because the rulings satisfy all four requisite elements. The Majority does not reach this argument, but I also find it unpersuasive.

Appellants specifically contend:

> Th[e] ruling conclusively determined that it was safe to change Mother's visitation from supervised to unsupervised; that issue is important because [I.] . . . has a right to safety, and the Department and the [c]ourt have duties to protect his safety; the issue is separate from the merits because visitation is not a necessary component to resolving a CINA case; and the issue will be effectively unreviewable on appeal because [I.'s] safety is irrevocably endangered each time he visits with Mother on an unsupervised basis."

Mother argues that the visitation ruling included in the December 2023 Order is not appealable under the collateral order doctrine because the ruling "does not conclusively determine the disputed question of whether [Mother] and [I.] should be reunified[.]" Mother additionally contends that the change to unsupervised visitation is not "completely separate from the merits of the action" because it "is part of the issue of whether [Mother] can have full custody" and that the decision "is reviewable from an entry of a final judgment."

This Court, in *In re Katerine L.*, stated:

> [T]he collateral order doctrine is a very narrow exception to the general rule that appellate review ordinarily must await the entry of a final judgment disposing of all claims against

5

all parties. It is applicable to a small class of cases in which the interlocutory order sought to be reviewed (1) conclusively determines the disputed question, (2) resolves an important issue, (3) resolves an issue that is completely separate from the merits of the action, *and* (4) would be effectively unreviewable if the appeal had to await the entry of a final judgment. . . .

The four elements of the test are conjunctive in nature, and in order for a prejudgment order to be appealable, each of the four elements must be met.

220 Md. App. at 442 (citations and internal marks omitted). Notably, interlocutory "orders are not appealable as collateral orders [when] the orders are subject to review and change" and "do not conclusively determine [] custody[.]" *In re Billy W.*, 386 Md. at 692 (citing *In re Samone H.*, 385 Md. at 315 n.13).

The visitation ruling in the December 2023 Order does not conclusively determine a disputed question and is not completely separate from the merits of the action. Modification of visitation is closely tied to the ultimate disputed issue of permanency for I. Visitation is subject to review and change until I.'s CINA case has been terminated and, thus, was not conclusively determined. *See In re Katerine L.*, 220 Md. App. at 438 (citing CJP § 3-823(h)). Visitation is also not completely separate from the custody issue because, in the December 2023 Order, the court ordered unsupervised visits "[b]ased on the change in permanency plan[.]" As all four elements of the collateral order doctrine are not satisfied, the visitation rulings are not appealable.

I would conclude that the December 2023 and May 2024 orders are not appealable pursuant to CJP § 12-303(3)(x) and are not appealable under the collateral order doctrine.

6

I would, thus, hold that the orders are not reviewable by this Court and I would dismiss the appeals.  As such, I respectfully dissent.